IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TAMARRA E. STUPPARD-WILSON,
as administratrix for the estate of Dino
Vandarrel Walker, deceased,

     Plaintiff,

     v.

FULTON COUNTY, GEORGIA, et al.,

     Defendants.

CIVIL ACTION FILE
NO. 1:24-CV-3400-TWT

## OPINION & ORDER

This is a civil rights action. It is before the Court on the Defendants'
individual Motions to Dismiss [Docs. 22, 23, 24] and the Plaintiff's Motions for
Leave to File a Supplement to the First Amended Complaint [Doc. 36], for
Clarification [Doc. 37], and to Take Judicial Notice [Doc. 45]. For the following
reasons, the Plaintiff's Motions to Supplement and for Clarification [Docs. 36,
37] are GRANTED. The Plaintiff's Motion to Take Judicial Notice [Doc. 45] is
GRANTED in part and DENIED in part. The Defendant Fulton County's
Motion to Dismiss [Doc. 22] is GRANTED; the Defendant Curt Muhammad's
Motion to Dismiss [Doc. 23] is GRANTED in part and DENIED in part; and
the Defendant Patrick Labat's Motion to Dismiss [Doc. 24] is GRANTED.

# I.  Background[1]

This case arises out of the murder of Dino Walker, who was an inmate at the Fulton County Jail at the time of his death. (Suppl. Compl. § 1).[2] The Plaintiff, Tamarra E. Stuppard-Wilson, is the personal representative of Walker's estate. (*Id.* ¶ 4). On September 22, 2022, Walker was fatally stabbed by another inmate at the jail using "an apparent makeshift knife or shank." (*Id.* ¶ 14).

Walker first entered the jail in December 2020 as a pretrial detainee. (*Id.* ¶ 46). In April 2022, Walker was attacked within the jail by multiple inmates. (*Id.* ¶ 47). Jail officials, including the Sheriff, were aware of the attack. (*Id.* ¶¶ 48, 51). Walker remained housed in an area of the jail known as 7North after the attack, which the Plaintiff alleges houses "the jail's most dangerous detainees/inmates." (*Id.* ¶¶ 50, 53). On September 22, 2022, Defendant Curt Muhammad ("Officer Muhammad") was assigned to 7North for his shift as a detention officer. (*Id.* ¶ 54). At approximately 8:35 PM that day, Officer Muhammad left 7North with the inmates out of their cells and unattended. (*Id.* ¶ 57). It is Fulton County Sheriff's Office policy that a

---

[1] The Court accepts the facts as alleged in the Amended Complaint as true for purposes of the present Motion to Dismiss. *Wildling v. DNC Servs. Corp.*, 941 F.3d 1116, 1122 (11th Cir. 2019).

[2] As explained in Section II. A. a., *infra*, Plaintiff's Supplemental Complaint [Doc. 36] is the operative pleading for purposes of ruling on the pending Motions to Dismiss.

detention officer conduct security rounds in a housing unit once per hour. (*Id.* ¶ 56). At approximately 9:00 PM, inmates from the unit reported to the tower officer that Walker was on the floor, unresponsive, and bleeding. (*Id.* ¶ 58). The tower officer radioed Officer Muhammad to return to 7North. (*Id.* ¶ 60). Another detention officer, Officer Hugger, left 7South to attend to the situation in 7North. (*Id.* ¶ 62). After finding Walker face down in a pool of blood, Officer Hugger called for medical help. (*Id.* ¶¶ 64-65). Officer Muhammad arrived back at 7North around 9:15 PM, and Walker was pronounced dead at 10:12 PM. (*Id.* ¶¶ 68, 71).

Inmates are able to fashion weapons like the one used to kill Walker from the "crumbling physical infrastructure of the jail." (*Id.* ¶¶ 27, 88). The jail, which was built to hold up to 1,125 inmates, holds on average 3,600 inmates at a time. (*Id.* ¶ 23). In the fall of 2021, Defendant Sheriff Patrick Labat ("Sheriff") gave the Fulton County Board of Commissioners a tour of the jail to allow them to observe its deteriorating state as well as the conditions that "contributed to the violent and dangerous atmosphere there.' (*Id.* ¶ 26). The United States Department of Justice ("DOJ") initiated an investigation of the jail and Defendant Fulton County on July 13, 2023, and representatives conducted a site visit, including meeting with the Sheriff, on July 21, 2023. (*Id.* ¶¶ 32, 42, 72). The DOJ released its investigation report on November 14, 2024. (*Id.* ¶ 73). Among the DOJ's findings in that report were that the jail is

regularly understaffed, leading to inadequate security rounds in the jail's housing units. (*Id.* ¶¶ 109, 111).

The County, through the Fulton County Board of Commissioners provides funding for the jail's operations. (*Id.* ¶ 133). The Plaintiff alleges that the Sheriff made "repeated funding requests" to the Board and, in January 2021, the Sheriff told the Board that "without additional funding or space he would be unable to fulfill his constitutional obligations to detainees at the jail." (*Id.* ¶ 139). The Plaintiff alleges that, despite these requests, the requested funding was not provided. (*Id.* ¶ 138). The Plaintiff also alleges that the Sheriff regularly misused funds in the "Inmate Welfare Fund" on items unrelated to inmate welfare, prompting the Board to close the fund. (*Id.* ¶¶ 118, 169, 174). This fund was originally intended for "recording all concession purchases, sales, and other welfare disbursements." (*Id.* ¶ 172).

The Plaintiff filed suit on July 31, 2024 raising six numbered claims: *Monell* liability under the 14th Amendment and 42 U.S.C. § 1983 against the County (Count I); deliberate indifference under the 14th Amendment and § 1983 against the Sheriff and Muhammad (Counts II and III); "violation of ministerial duties under Georgia law" against Muhammad (Count IV); and two claims for supervisory liability under § 1983 against the Sheriff (Counts V and VI). (*Id.* ¶¶ 31-269). She also seeks wrongful death damages under Georgia law against all of the Defendants and punitive damages against the Sheriff and

Muhammad. (*Id.* ¶¶ 270-273). The Defendants' individual Motions to Dismiss all claims are presently before the Court, [Docs. 22-24], as well as the Plaintiff's Motion for Leave to File a Supplemental Complaint, [Doc. 36], Motion for Clarification, [Doc. 37], and Motion for Judicial Notice [Doc. 45]. The Court will address the Plaintiff's procedural motions before turning to the Defendants' Motions to Dismiss.

## II.  Discussion

### A.  Plaintiff's Motions

#### a.  Motions to Supplement and for Clarification [Docs. 36-37]

The Plaintiff seeks leave to supplement her First Amended Complaint pursuant to Fed. R. Civ. P. 15(d) to add references and citations to the DOJ Report, which was released on November 14, 2024. [Doc. 36 at 1-6]. She asserts that the DOJ Report references Mr. Walker's death and implicates the claims she has asserted against the Defendants. [*Id.* at 8-10]. The Plaintiff contends that her request is undertaken in good faith and that permitting the supplement would not prejudice the Defendants. [*Id.* at 15-18]. In her Motion for Clarification, the Plaintiff states that she erroneously represented in her Motion to Supplement that she conferred with defense counsel for consent prior to filing. [Doc. 37 at 1-2].

The Court will grant the Plaintiff's request and permit her to file her proposed supplement to the First Amended Complaint. Rule 15(d) of the

Federal Rules of Civil Procedure permits a party to move to "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The Eleventh Circuit has applied the same standards that govern leave to amend under Fed. R. Civ. P. 15(a)(2) to motions for leave to supplement under Rule 15(a)(d). *See Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Regul. and Elections*, 36 F4th 1100, 1126 (11th Cir. 2002) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1211 (11th Circ. 2008). Rule 15(a)(2) provides that a court should "freely" give leave to amend a pleading "when justice so requires." This decision is discretionary, but the Eleventh Circuit has explained that "district courts should generally exercise their discretion in favor of allowing amendments to reach the merits of a dispute." *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1000 (11th Cir. 2021).

Curiously, the Defendants argue that the Plaintiff has failed to identify "what, if any, information happened after the date of her Complaint." (Defs.' Resp. in Opp. to Mot. to Suppl., at 3-6). The Plaintiff plainly and accurately stated that the DOJ Report was not released until November 2024, a month after the First Amended Complaint was filed. Given that leave to supplement should be freely granted, the Court finds the release of this report to be an event or occurrence within the meaning of Rule 15(d). *See* Fed. R. Civ. P. 15(d)

(noting that a supplemental pleading must set out "*any* transaction, occurrence, or event that happened after the date of the pleading to be supplemented" (emphasis added)). And to the extent the Defendants argue that the DOJ Report does not constitute a "change in the facts," the Court disagrees—the release of the report signified that the DOJ had completed its investigation into the Fulton County Jail. (*See* Defs.' Resp. in Opp. to Mot. to Suppl., at 6 (citing *Harris v. Garner*, 216 F.3d 970, 982 (11th Cir. 2000)). The Defendants have not argued that granting the Plaintiff leave to supplement would result in any prejudice, and the Court does not believe it would. So, the Plaintiff's Motion to Supplement [Doc. 36] will be granted.[3] The Court will consider the Supplemental Complaint for the purposes of addressing the Defendants' pending Motions to Dismiss.[4]

### b. Motion to Take Judicial Notice [Doc. 45]

The Plaintiff also asks the Court to take judicial notice of "the existence and contents of" a consent decree entered in another action in this district—*United States v. Fulton County, et al.*, 1:25cv0024-LMM (N.D.Ga.). (Pl.'s Mot. to Take Judicial Notice, at 1). The Plaintiff essentially seeks to use Defendants

---

[3] Although not truly a motion, the Court will nonetheless grant the Plaintiff's Motion for Clarification [Doc. 37].

[4] Supplemental pleadings "represent additions to or continuations of the earlier pleadings;" therefore, granting the Plaintiff's Motion does not moot the Court's consideration of the Defendants' pending Motions to Dismiss. 6A Wright & Miller's Federal Practice & Procedure § 1504 (3d ed. 2025).

Fulton County and Sheriff Labat's agreement via the consent decree to address certain issues in the jail as evidence in support of her claims against them in the present action. (*See id.* at 6-14 ("[C]onstitutional and statutory violations the Defendants deny in their respective Motions to Dismiss, are readily admitted by their agreement to the remedial terms of the Consent Decree."). The Defendants oppose the Motion, arguing that the consent decree is not relevant to the present action. (Defs.' Resp. in Opp. to Pl.'s Mot. to Take Judicial Notice, at 5-6).[5]

The Eleventh Circuit has noted that "the taking of judicial notice of facts is, as a matter of evidence law, a highly limited process" because it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). Therefore, district courts can take notice of facts "only where the fact in question is one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* (citing Fed. R. Evid. 201(b)) (quotation marks omitted). With regard to documents filed in other courts, a court may take

---

[5] The Defendants also argue that the Plaintiff actually seeks to have the Court take judicial notice of the DOJ Report rather than the consent decree. The Court disagrees with this interpretation; the Plaintiff discusses the DOJ Report but asks the Court to take judicial notice of the contents of the consent decree.

judicial notice "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (quotation marks and citation omitted). Specifically, a court can take judicial notice of another court's order "only for the limited purpose of recognizing the judicial act that the order represents or the subject matter of the litigation." *Id.* (quotation marks and citation omitted).

The Plaintiff's request is plainly unsupported by the law of this Circuit. In essence, the Plaintiff asks the Court to consider the terms of the consent decree "for the truth of the matters asserted in the other litigation"—in other words, as evidence that the Defendants have agreed to remedy issues leading to the constitutional and statutory violations that the Plaintiff alleges were committed here. *See Jones*, 29 F.3d at 1553. As an initial matter, the factual findings in a court's order cannot satisfy Rule 201(b)'s indisputability requirement. *Id.* Thus, relevancy arguments aside, the Court cannot take judicial notice of the terms of the consent decree. In explaining the dangers of expanding judicial notice beyond this limited scope, the Eleventh Circuit opined that "if it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." *Id.* The danger is even greater here where there were no findings made in the other action, since parties may

choose to resolve litigation by consent decree for a variety of reasons that do not include admitting liability. It is for this reason that the law limits a court's ability to take judicial notice of another court's order to recognizing the act of entering the order.

The Defendants misread *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 to write a strict relevancy requirement into Rule 201. Setting aside the question of whether that requirement exists in cases outside the scope of securities fraud, the Defendants' relevancy arguments touch only on the contents of the consent decree rather than the entry of the consent decree itself. But Rule 201(c)(2) instructs that the court "must take judicial notice if a party requests it and the court is supplied with the necessary information." The Court will thus grant the Plaintiff's Motion [Doc. 45] in part and take judicial notice only of the fact that a consent decree was entered in *United States v. Fulton County, et al.*, 1:25cv0024-LMM (N.D.Ga.) in accordance with the Eleventh Circuit's guidance in *Jones*. The Motion will be denied in all other respects.

## B. Defendants' Motions to Dismiss

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the

possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

### a. Fulton County [Doc. 22] – Count I

#### i. *Monell* Liability

The Plaintiff asserts a claim against the County under the 14th Amendment and *Monell v. Dep't of Soc. Servs.,* 429 U.S. 1071 (1977) and seeks damages under Georgia law for wrongful death pursuant to O.C.G.A. § 51-4-2. The County argues that the claim against it must be dismissed under Rule 12(b)(6) because the Plaintiff has failed to establish any of the three elements of a *Monell* claim. (County's Mot. to Dismiss, at 7-15). The County also argues

11

that to the extent the Plaintiff has asserted a claim against it based on the Sheriff's conduct under a respondeat superior theory, it has no authority over the Sheriff or his employees. (*Id.* at 16-17). In response, the Plaintiff argues that the County violated Mr. Walker's constitutional rights "through a persistent and widespread practice of underfunding the jail thereby promoting violence, understaffing and continuing physical deterioration of the Jail so that weapons . . . might be crafted from the crumbling jail infrastructure." (Pl.'s Resp. in Opp. to County's Mot. to Dismiss, at 8-9).

Under *Monell*, a local government body is liable under § 1983 when the execution of its policy or custom constitutes the "moving force" that inflicts injury upon an individual in violation of her constitutional rights. *Monell*, 436 U.S. at 694. To state a claim for § 1983 liability against a municipality or other local government entity, a plaintiff must allege plausible facts showing (1) that his constitutional rights were violated, (2) that the municipality had a custom or policy that constituted deliberate indifference to his constitutional rights, and (3) that the custom or policy caused his constitutional violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). A plaintiff "has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (citations omitted).

The present case does not implicate an officially promulgated County policy, so only the unofficial custom or practice inquiry is relevant here.

The Court agrees with the County that the Supplemental Complaint fails to adequately allege a *Monell* claim. The crux of the Plaintiff's argument is that the County's failure to adequately fund the Jail resulted in a proliferation of violence at the jail often carried out via handmade shanks, such that this underfunding constituted deliberate indifference to Mr. Walker's constitutional rights. The Court will assume for the purposes of this analysis that Mr. Walker suffered a violation of his constitutional rights. But as to the second *Monell* prong, Plaintiff has not properly alleged that the County had a custom or policy that constituted deliberate indifference to those rights. *See McDowell*, 392 F.3d at 1289. The Supplemental Complaint identifies only one specific request for increased funding, in January 2021, and otherwise summarily states that the Sheriff made "repeated funding requests." (Supp. Compl. [Doc. 36] ¶¶ 134, 139). A single denied funding request and a general allegation that other funding requests were denied are insufficient under Eleventh Circuit law to establish a "persistent and wide-spread practice" of underfunding the jail. *See, e.g., Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1263 n.11 (11th Cir. 2010) (holding that a single, isolated incident is insufficient to establish a custom or practice of deliberate indifference to constitutional rights); *McDowell*, 392 F.3d at 1289-91 ("McDowell cannot rely

on a generalized policy of understaffing."). In any event, the Sheriff's January 2021 funding request for $6.8 million dollars that the Plaintiff appears to cite was granted.[6] *See Fulton Cnty. Bd. of Comm'rs Meeting*, at 4:48:00-6:09:39 (YouTube, Jan. 20, 2021), https://www.youtube.com/watch?v=Dv2TJh0C-XE.

Even if these allegations sufficiently established a custom or policy of underfunding the jail, they do not rise to the level of deliberate indifference. Under the facts of this case, deliberate indifference would require allegations that the County "deliberate[ly] inten[ded] to inadequately" fund the jail, despite "known or obvious consequences." *McDowell*, 392 F.3d at 1291. While the Plaintiff makes several allegations that the County—via its Board of Commissioners—was aware of the deteriorating condition of the Jail and of the increasing violence, knowledge and neglect do not rise to the "requisite degree of culpability" that constitute deliberate indifference. *Id.* ("Plainly stated, a showing of simple or even heightened negligence is not enough." (quotation marks and citation omitted)). More critically, here, the Plaintiff alleges that the County was informed of the ongoing issues with the state of the jail,

---

[6] The County asks the Court to incorporate the video recording of the January 2021 Board of Commissioners hearing based on the Plaintiff's references to that hearing in the Supplemental Complaint, and the Plaintiff has not opposed that request. The Court finds that it can properly consider the video recording under the factors outlined in *Luke v. Galley*, 975 F.3d 1140, 1144 (11th Cir. 2020). *See also Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276-77 (11th Cir. 2023) (extending the incorporation by reference doctrine to video footage).

including the rise in handmade shanks and resulting violence, in the Fall of 2021 and ongoing into 2023. (Suppl. Compl. §§ 26-29). However, the only funding request that the Plaintiff specifically identifies was made prior to that in January 2021, and there are no allegations in the Supplemental Complaint that the County was informed of the handmade weapons issue at that time. (*Id.* ¶ 139 (stating generally that the Sheriff told the County that "without additional funding or space he would be unable to fulfill his constitutional obligations to detainees at the Jail."). Thus, even construing the facts in the light most favorable to the Plaintiff, the Court cannot infer that the County made any budget decisions *with knowledge of* a "plainly obvious consequence," i.e., Mr. Walker's death by a handmade shank. *McDowell*, 392 F.3d at 1292-93.

Finally, the Plaintiff has not adequately alleged that the County's purported custom of underfunding the jail was the "moving force" behind Mr. Walker's death. *Id.* at 1292. The connection that the Plaintiff alleges between the County's alleged practice of underfunding the jail and Mr. Walker's death by a handmade shank is too attenuated to be actionable under *Monell. See Cuesta v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 285 F.3d 962, 967 (11th Cir. 2002) ("It is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation."). As the Eleventh Circuit aptly stated in *McDowell*, "[w]hile it may be true that the Board's budget decision would make a violation of his constitutional rights more *likely,* that alone cannot give

rise to an inference that a policy maker's failure to scrutinize the budget produced a specific constitutional allegation." *McDowell*, 392 F.3d at 1292 (quotation marks, alterations, and citation omitted). The same holds true here—although the Plaintiff has alleged that the County knew generally of the deteriorating conditions in the jail when it denied the Sheriff's funding requests, the Court cannot infer on that basis that its alleged failure to adequately fund the jail was the "moving force" behind Mr. Walker's death. *See also Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019) (noting that to demonstrate causation for *Monell* liability, the constitutional violation must have been carried out "pursuant to" the custom or policy). For all of these reasons, the Plaintiff's *Monell* claim against the County fails, and Count I will be dismissed.

### ii. Damages

The County further argues that the Plaintiff's claim for damages under the Georgia wrongful death statute is precluded because she failed to timely present an ante litem notice under O.C.G.A. § 36-11-1 and, regardless, the County is entitled to sovereign immunity under the Georgia constitution. (County's Mot. to Dismiss, at 17-19). The Plaintiff argues that the ante litem notice was submitted to the County within the one-year period provided under the statute and does not address the County's sovereign immunity argument. (Pl.'s Resp. in Opp. to Mot to Dismiss, at 16-19). Determining this issue will

require the Court to get into the weeds of statutory interpretation.

O.C.G.A. § 36-11-1 provides that "[a]ll claims against counties must be presented within 12 months after they accrue or become payable or the same are barred." The Georgia high courts have not yet addressed the question of whether a claim is "presented" so long as an ante litem notice is properly mailed before the 12-month period runs, or if the claim must be received by the county defendant before the 12-month deadline. The Supreme Court of Georgia has addressed the statute's municipal counterpart, O.C.G.A. § 36-33-5, which contains the same presentment language. In discussing the history of both statutes, the court approved of "look[ing] to cases interpreting and applying the municipal ante litem notice statute as an aid to its understanding of O.C.G.A. § 36-11-1," going as far as to say that "the municipal ante litem notice and county presentment statutes have similar objects and purposes, and they generally ought to be construed consistently, except, of course, where the statutory text indicates otherwise." *Croy v. Whitfield County*, 301 Ga. 380, 383 (2017). Interpreting O.C.G.A. § 36-11-1 consistently with O.C.G.A. § 36-33-5 also squares with Georgia's longstanding adherence to the doctrine of in pari materia. *Crowe v. Scissom*, 365 Ga. App. 124, 135 (2022) ("It is true that a statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter . . . are construed together, and harmonized whenever possible, so as to ascertain the legislative

17

intendment and give effect thereto.").

O.C.G.A. § 36-33-5 expressly states that a claim under that statute may be made by certified mail or statutory overnight delivery but is silent about whether the claim must be received by the would-be defendant before the 12-month period elapses. The Supreme Court of Georgia very recently addressed this subsection, O.C.G.A. § 36-33-5(f), and indicated that mailing the notice "to the correct address by any of the permitted statutory methods" constitutes substantial compliance with the service requirement of the statute. *See Fleureme v. City of Atlanta*, 2025 WL 1737102, at *4 (Ga. June 24, 2025). In so finding, the court noted that it "would make little sense to require plaintiffs to get the ante litem notice into the hands" of the proper official given that, in context, "to deliver something means to give or transfer possession of it." *Id.* In buttressing this conclusion, the court cited with approval *Norris v. Ga. Dep't of Transp.*, 268 Ga. 192 (1997), the case the Plaintiff here relies on in support of her position that the ante litem notice was timely delivered to the County. So, it seems that the ante litem notice here—mailed on September 22, 2023, and received by the County on September 25, 2023—was timely presented to the County within 12 months of Mr. Walker's death on September 22, 2022.[7] (*See* First Am. Compl., [Doc. 20], Ex. C). Therefore, O.C.G.A.

---

[7] The County asked the Court to certify this issue to the Supreme Court of Georgia but raised this request for the first time in its reply brief. (*See* County's Reply in Supp. of Mot. to Dismiss, at 8). The Court thus declines to

§ 36-11-1 does not bar the Court's consideration of the Plaintiff's claim for wrongful death damages.

The County also asserts that it is entitled to sovereign immunity unless its immunity has been waived by statute, *see* Ga. Const. Art. I, § 2, ¶ 9, and the Plaintiff has not identified any such statute here. Once a defendant raises the sovereign immunity defense, it is the plaintiff's burden to demonstrate that immunity has been waived. *Baldwin Cnty. v. Dep't of Behav. Health and Dev. Disabilities*, 371 Ga. App. 762, 762-63 (2024). As the Plaintiff here failed to respond to the County's sovereign immunity argument, the County is entitled to sovereign immunity. The County's Motion to Dismiss [Doc. 22] will be granted as to this claim.

### b. Officer Muhammad – [Doc. 24]

#### i. 14th Amendment Deliberate Indifference – Count III

The Plaintiff asserts a deliberate indifference claim against Officer Muhammad, alleging that "abandoning his post of duty" constituted deliberate indifference to the substantial risk of harm to Walker. (Suppl. Compl. ¶ 224-31). In his Motion to Dismiss, Officer Muhammad argues that he had no knowledge of Walker's serious medical needs in advance and, when he observed Walker in distress, he acted immediately. (Officer Muhammad's Mot.

---

consider it. *Sapuppo v. Allstate Fla. In. Co.*, 739 F.3d 678, 682-83 (11th Cir. 2014).

to Dismiss, at 8-9). However, the Plaintiff did not raise a claim of deliberate indifference to a serious medical need; the Supplemental Complaint makes clear that her claim is for deliberate indifference to Walker's safety and a resulting failure to protect him. Moreover, Officer Muhammad's motion cites the now-overruled "more than gross negligence" standard for deliberate indifference rather than the current standard of subjective recklessness. *See Wade*, 106 F.4th at 1255.[8] Officer Muhammad also asserts that qualified immunity bars "any claims" the Plaintiff has against him, but his arguments touch only on the Plaintiff's claim for violation of ministerial duties under state law. (*See* Officer Muhammad's Mot. to Dismiss, at 11-14 ("Contrary to Plaintiff's asserted legal conclusion, the Complaint is devoid of any factual allegations that would indicate that Defendant Muhammad was engaged in a ministerial act at the time of the subject incident such that qualified immunity would be inappropriate.")). Out of an abundance of caution, the Court will address qualified immunity with regard to the Plaintiff's deliberate

---

[8] Officer Muhammad does cite the correct standard in his reply brief, but he fails to interact with the standard beyond merely stating that his conduct did not rise to the level of subjective recklessness. (Officer Muhammad's Reply in Supp of Mot. to Dismiss, at 2-3). While Officer Muhammad addresses the reasonableness of the actions he was undertaking while he was absent from 7North, he does not address the reasonableness of the act the Plaintiff alleges constituted deliberate indifference—the act of leaving 7North completely unattended for approximately 45 minutes while the inmates were out of their cells. (*See id.* at 3-4); (Suppl. Compl. ¶¶ 57, 68, 227-29).

indifference claim because "it is proper to grant a motion to dismiss on qualified immunity grounds when the complaint fails to allege the violation of a clearly established constitutional right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quotation marks and citation omitted).

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (quotation marks omitted). "A defendant who asserts qualified immunity has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action." *Id.* at 1297. Once that is shown (and it is not challenged here), "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate by showing that (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct." *Id.* The Court has discretion to decide these issues in either order depending on the circumstances, but the Plaintiff must demonstrate both prongs to survive a qualified-immunity defense. *See Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

"A prison official acted with deliberate indifference if he (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to subjective recklessness." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024) (citation omitted). To make the subjective recklessness showing, a plaintiff must show that "the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm—with the caveat that, in any event, a defendant who responds reasonably to a risk, even a known risk, cannot be found liable." *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quotation marks, brackets, and citation omitted).

The Court finds that the Plaintiff has carried her burden of showing that Officer Muhammad violated Walker's clearly established constitutional rights by knowingly leaving the inmates of 7North unattended and that Officer Muhammad is therefore not entitled to qualified immunity as to the Plaintiff's deliberate indifference claim. Here, the Plaintiff has alleged that 7North was one of the most violent areas of the jail. She alleged that Officer Muhammad knew that Walker had been previously attacked by another inmate in 7North. She also alleged that Officer Muhammad was assigned as the only detention officer for 7North on the night of Walker's death and that he knew the inmates were out of their cells when he left 7North to attend to other matters. Viewing these allegations in the Plaintiff's favor, is not a great leap for the Court to find

that Muhammad knew that leaving inmates unattended in one of the most violent areas of the jail for approximately 45 minutes—especially given the Plaintiff's allegations of the condition of the jail and the inmates' proclivities for crafting weapons out of the jail's infrastructure—carried a risk of serious harm to Walker. (*See* Suppl. Compl. ¶¶ 15, 50, 51, 53, 57, 68, 69). Officer Muhammad disregarded that risk by leaving the inmates, and specifically Walker, unattended. To that end, Officer Muhammad does not rebut the Plaintiff's assertion that he took no measures to abate the risk his absence might impose by, for example, asking another detention officer to monitor 7North in his absence. (Pl.'s Resp. in Opp. to Officer Muhammad's Mot. to Dismiss, at 9). Plainly, there is no colorable argument here that Officer Muhammad's decision to leave 7North completely unattended was appropriate, and these allegations clearly satisfy the subjective recklessness standard. *Wade*, 106 F.4th at 1255 (holding that a defendant acts with subjective recklessness when he "was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm")); *id.* at 1258 (noting that "in addition to subjectively recognizing the substantial risk, the prison official must also subjectively be aware that his actions were inappropriate in light of that risk" (citation and brackets omitted)).

While Officer Muhammad attempts to negate this conclusion by arguing that he responded reasonably once the tower officer alerted him that Walker

was found lying face down in a pool of blood, (Suppl. Compl. ¶¶ 58, 60-61), the law only allows him to escape liability for his actions "if he responded reasonably *to the risk.*" *Wade*, 106 F.4th at 1257 (emphasis added). Officer Muhammad's actions in returning to 7North once he was radioed are irrelevant because, at that point, the risk of harm to Walker (i.e., a fatal attack) had already materialized. In other words, it was too little too late. Having shown that Officer Muhammad's conduct amounted to deliberate indifference, and therefore that Walker's constitutional rights were violated, the Plaintiff must still establish that the right at issue was clearly established at the time in order to avoid the application of qualified immunity.

The Eleventh Circuit has explained that, to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (citation omitted). To that end, "an official's awareness of the existence of an abstract right . . . does not equate to knowledge that *his* conduct infringes the right." *Id.* at 1312 (quotation marks and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of the pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). With this backdrop in mind, there are three ways a plaintiff

can show that the right at issue was clearly established. First, she can show that "a materially similar case has already been decided;" second, she can show "that a broader, clearly established principle should control the novel facts of a particular situation;" or third, she can show that "her case fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Id.* (quotation marks, brackets, and citations omitted).

Viewing the facts in the Plaintiff's favor, the Court easily finds that the third prong is satisfied here. Given that Walker had a constitutional right to physical safety in the jail, it is obvious that leaving a cellblock unattended with inmates out of their cells for approximately 45 minutes seriously threatened the inmates' safety, including Walker's. *See Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates." (quotation marks and citation omitted)). And there is no question that, under the facts alleged in the Supplemental Complaint, Officer Muhammad knew he failed to take reasonable measures to guarantee the safety of the 7North unit when he left it unattended. *Corbitt*, 929 F.3d at 1311 (providing that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Accordingly, the Court finds the clearly established prong is satisfied, so Officer Muhammad is not entitled to qualified immunity on the Plaintiff's deliberate indifference claim. *Gates*, 884 F.3d at

1296-97. And since Officer Muhammad did not truly raise a failure to state a claim argument as to this claim, (*see* Officer Muhammad's Mot. to Dismiss, at 7-9), the claim may proceed, and his Motion to Dismiss [Doc. 23] is due to be denied as to the deliberate indifference claim.

### ii.   Violation of Ministerial Duties under State Law – Count IV

In Count IV, the Plaintiff alleges that Officer Muhammad committed a constitutional violation under Ga. Const. Art. I, § I, ¶¶ I & II based on his failure to conduct his ministerial duties during the hour of Walker's death; namely, for failing to perform a visual welfare check of 7North every 30 minutes in accordance with the Fulton County Sheriff's Office's policies. (Suppl. Compl. ¶¶ 233-240). The Plaintiff does not identify what state law she seeks to bring this claim under, but given the reference to the Georgia Constitution, it appears that she seeks to bring the state law equivalent of a § 1983 claim.

The Georgia Court of Appeals recently reiterated its longstanding precedent that "Georgia law contains no equivalent to 42 U.S.C. § 1983, which gives a claim against a state officer individually for certain unconstitutional acts . . . [b]ased on this authority, there is no viable private cause of action against [an officer] for his alleged constitutional violations." *Collins v. Schantz*, 369 Ga. App. 282, 286-87 (2023) (citing *Howard v. Miller*, 222 Ga. App. 868, 871 (1996) (quotation marks omitted). The Plaintiff therefore fails to state a

26

claim against Officer Muhammad for any purported violation of his ministerial duties. Accordingly, the Court will grant Officer Muhammad's Motion to Dismiss [Doc. 23] as to Count IV.

### iii.  Punitive Damages

The Plaintiff seeks punitive damages from Officer Muhammad based on her deliberate indifference claim. Officer Muhammad argues that the Plaintiff has not stated a claim for punitive damages because his actions of acknowledging the tower officer's call for help for Walker, responding within minutes, and calling for medical assistance do not constitute willful or malicious conduct. Officer Muhammad's arguments miss the mark. The conduct at issue in the Plaintiff's deliberate indifference claim is not what Officer Muhammad did after the attack on Walker was reported, it is the act of leaving 7North unattended. This conduct is what must be "motivated by evil motive or intent or . . . involve[] reckless or callous indifference to the federally protected rights of others" in order for a punitive damages claim to lie. *Hooks v. Brewer*, 818 Fed. App'x 923, 931 (11th Cir. 2020) (citing *Smith v. Wade*, 461 U.S. 30 (1983)). Viewing the facts in the Plaintiff's favor, it is plausible that Officer Muhammad's act of leaving 7North unattended constituted reckless or callous indifference to Walker's right to reasonable safety within the jail. That is enough for the Plaintiff's punitive damages claim to survive at this stage. See *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. Thus, the Court will

27

deny Officer Muhammad's Motion to Dismiss [Doc. 23] as to the punitive damages claim against him.[9]

### c. Sheriff Labat – [Doc. 23]

The Plaintiff asserts claims against the Sheriff in his individual capacity under § 1983 for deliberate indifference, supervisory liability arising from Muhammad's alleged failure to perform security rounds during the hour of Mr. Walker's death, and supervisory liability for failing to relocate Mr. Walker in April 2022. She also seeks damages under Georgia law for wrongful death as well as punitive damages. The Sheriff argues that the federal claims against him are barred by qualified immunity and the state law claims are barred by official immunity. (Sheriff's Mot. to Dismiss, at 13-18). He also argues that the Plaintiff fails to state any of her claims under Rule 12(b)(6) and that, because all of her underlying claims are due to be dismissed, her claim for punitive damages also fails. (*Id.* at 7-13, 18-19).

Because immunity entitles a defendant to "immunity from suit rather than a mere defense to liability," the Court is obliged to address the Sheriff's immunity arguments before addressing, if need be, his merits arguments. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). The Plaintiff here has failed to

---

[9] The Court notes that although the Plaintiff seeks damages against Officer Muhammad for wrongful death under Georgia law, (Suppl. Compl. ¶¶ 270-71), he did not move to dismiss this claim. (*See generally* Officer Muhammad's Motion to Dismiss).

state any claims under § 1983 against the Sheriff because he is entitled to qualified immunity under the facts alleged in the Supplemental Complaint on the Plaintiff's deliberate indifference and supervisory liability claims.

### i. 14th Amendment Deliberate Indifference – Count II[10]

As an initial matter, the Plaintiff has not challenged the Sheriff's assertions that, for qualified immunity purposes, he was acting within the scope of his discretionary authority in utilizing funds from the Inmate Welfare Fund. *See Gates*, 884 F.3d at 1297. Thus, the burden shifts to the Plaintiff to demonstrate that the facts alleged make out a violation of a clearly established constitutional right. *See id.* As pled, the Plaintiff's allegations with regard to this claim do not make out a violation of a clearly established constitutional right. *Gates*, 884 F.3d at 1296; *Quality Foods de Centro Am., S.A.*, 711 F.2d at 994-95. She alleges that the Sheriff's misuse of the Inmate Welfare Fund diverted funds from being used to improve or staff the jail, which the Plaintiff contends would have "arguably discouraged the knife attack on Dino Walker," and that the Sheriff's misuse of the funds constitute deliberate indifference to

---

[10] Walker was a pretrial detainee at the time of his death. (Suppl. Compl. ¶ 46). Accordingly, these claims arise under the Fourteenth Amendment rather than the Eighth Amendment. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005). Nonetheless, the standards applicable to deliberate indifference claims under the Eighth Amendment are identical to those under the Fourteenth Amendment. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013). Thus, the Court will rely in part on cases addressing deliberate indifference under the Eighth Amendment.

Walker's constitutional rights. (Suppl. Compl. ¶¶ 169-70, 174, 201, 207-12, 218). She further alleges that the Sheriff's misuse of the funds "was a direct and proximate cause of the injuries, damages, and death" of Walker. (*Id.* ¶ 220).

The Plaintiff has not shown that the facts alleged make out a viable deliberate indifference claim against the Sheriff. First, viewing the Supplemental Complaint in the light most favorable to the Plaintiff, she does allege that the Sheriff knew of a substantial risk of harm to Walker based on the April 2022 attack he suffered in 7North. (*See* Suppl. Compl. ¶ 51). However, under *Wade*, this is not enough. *Wade* makes clear that to state a claim of deliberate indifference, the substantial risk must be "caused" by the defendant's "own conduct—again, his own actions or inactions." *Wade*, 106 F.4th at 1258. But the action the Plaintiff alleges the Sheriff took, misusing the Inmate Welfare Fund, did not *cause* the risk of harm to Walker. Instead, the most favorable reading of the Supplemental Complaint is that the Sheriff's misuse of the funds meant a failure to attempt to mitigate the already existing risk to Walker's personal safety posed by the deteriorating condition of the jail. (*See* Suppl. Compl. ¶¶ 165-67 (noting that the Sheriff took office in January 2021 and, in the same month, asserted to the County that the lack of funding to improve the jail would prevent him from discharging his constitutional duties)). Put another way, Walker (and other inmates at the jail) faced the substantial risk of harm owed to the jail's deteriorating condition "in the

abstract," independently of the Sheriff's alleged misuse of the funds. *See Wade*, 106 F.4th at 1259 (interpreting Supreme Court precedent to say that the focus is on "whether the official knew that his own conduct . . . put the inmate at risk, not just whether the inmate confronted a risk in the abstract.").

Moreover, even assuming the Sheriff's alleged misuse of the Inmate Welfare Fund caused a substantial risk of serious harm to Walker, the Plaintiff has not adequately pleaded that the Sheriff's conduct amounted to subjective recklessness because, under the facts alleged, he was not aware that his conduct put Walker at risk. For example, the Plaintiff alleges more than once that the Sheriff was not aware of the ordinance and oversight committee governing the use of the Inmate Welfare Fund and therefore was unaware that he was misusing the funds under that ordinance, and he was simultaneously fighting for funding from the County to make improvements to the jail. (*See, e.g.*, Suppl. Compl. ¶¶ 119, 164, 166, 168, 179, 186, 197 (stating that "[s]ince becoming Sheriff . . . Defendant Labat has made numerous efforts to persuade [the County] to increase its funding to the Sheriff's Office [to alleviate the overcrowding, staffing, infrastructure, and violence issues]" and "Defendant Labat acknowledged to a WSB-TV reporter that he had no knowledge of the county ordinance governing the Inmate Welfare Fund until shortly before his staff provided it to the local reporter.")). The Plaintiff alleges that the WSB interview during which the Sheriff learned of the ordinance and oversight

committee took place on October 31, 2023, long after Walker's murder. Thus, at least as the Plaintiff has pled it, the Sheriff was unaware he was misusing the funds until that date, which negates any argument that he knew his specific conduct put Walker at risk of substantial harm. Additionally, the Plaintiff has not alleged that the Sheriff's alleged misuse of the funds put Walker specifically—as opposed to the inmate population generally—at substantial risk of serious harm.

Finally, under the facts alleged in the Supplemental Complaint, the Sheriff acted reasonably in trying to secure funding from the County to improve the jail's condition from the very beginning of his tenure. *See Wade*, 106 F.4th at 1257 (noting that "a prison official who acts reasonably cannot be found liable under the [8th Amendment]." (quotation marks, brackets, and citation omitted)). While the knowledge component of the deliberate indifference standard is subjective, the reasonable response component is objective. *Mosley v. Zachery*, 966 F.3d 1265, 1270-71 (11th Cir. 2020). Given that, as the Plaintiff pleads it, the Sheriff was unaware of his alleged misuse of the Inmate Welfare Fund until after Walker's death, his actions over the course of nearly two years in meeting with the Board of Commissioners to request funding, taking Commissioners on tours of the jail, and involving the DOJ in an investigation of the jail in order to shed light on the critical infrastructure issues it had were objectively reasonable. *Id.* at 1271 (noting

that the objective reasonableness inquiry is judged based on the facts the prison official knew at the time he responded to the risk of harm to the inmate). In the Court's view, at the time of Walker's September 2022 death, the Sheriff had been working in earnest to secure funding for much needed improvements at the jail. In fact, the Plaintiff herself alleges that the Sheriff "over a period of several years, repeatedly and vociferously decried the lack of Fulton County-allocated funds for urgent jail priorities." (Suppl. Compl ¶ 168). Under these facts, even viewed in the light most favorable to the Plaintiff, the Court cannot find that the Sheriff's response was unreasonable.

For all of these reasons, the Plaintiff has failed to adequately allege that the Sheriff acted with deliberate indifference to Walker's constitutional rights. Because she has failed to carry her burden of establishing a violation of Walker's constitutional rights, the Sheriff is entitled to qualified immunity as to the Plaintiff's deliberate indifference claim. *Gates*, 884 F.3d at 1296. So, the Court need not address the clearly established prong and the Plaintiff's arguments as to that prong. *Gaines*, 871 F.3d at 1208. Accordingly, the Court will grant the Sheriff's Motion to Dismiss [Doc. 24] as to Count II.

### ii. Supervisory Liability of Officer Muhammad for Alleged Failure to Perform Security Rounds – Count V

Next, the Plaintiff alleges that the Sheriff is liable for Officer Muhammad's act of leaving his post in 7North unattended on the night Walker was murdered because, due to the Sheriff's alleged failure to adequately staff

33

the jail, Officer Muhammad was the only officer assigned to 7North that night and 7North is a notoriously violent area of the jail. (Suppl. Compl ¶¶ 244-45, 249-50). She contends that by failing to provide for the continuous presence of detention officers in 7North when inmates were not in their cells, the Sheriff personally participated in violating Walker's constitutional rights. (*Id.* ¶ 249). The Sheriff argues that he did not personally participate in any alleged violation of Walker's constitutional rights as that phrase is defined under the applicable law. (Sheriff's Mot. to Dismiss, at 10-11).

The standard for holding a supervisor liable for the actions of his subordinate is "extremely rigorous." *Stalley v. Cumbie*, 124 F.4th 1273, 1288 (11th Cir. 2024). Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates under theories of respondeat superior or vicarious liability. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). "Therefore, a plaintiff seeking to hold a supervisor liable for constitutional violations must show that the supervisor either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Id.* The causal connection can be established in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so;" (2) "when a supervisor's custom or policy results in deliberate indifference to constitutional

34

rights;" or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (brackets and citation omitted). "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." *Goebert v. Lee County*, 510 F.3d 1312, 1332 (11th Cir. 2007). To constitute widespread abuse, a deprivation must be "obvious, flagrant, rampant, and of continued duration, rather than [an] isolated occurrence[]." *Harrison*, 746 F.3d at 1298 (quotation marks and citation omitted).

As previously discussed, the Plaintiff stated a plausible claim of deliberate indifference against Officer Muhammad for leaving 7North unattended during the hour of Walker's death. Because the Plaintiff's supervisory liability claim against the Sheriff here is based on the same underlying conduct, whether the Sheriff is entitled to qualified immunity turns on whether the Plaintiff has adequately alleged a causal connection between the Sheriff's actions and Officer Muhammad's act of leaving 7North unattended.

Although not entirely clear, the Plaintiff appears to assert that the Sheriff had a custom of understaffing the jail and that "[b]y not providing for the continuous presence of detention officers on 7-North when detainees were outside their cells, [the Sheriff] personally participated in the violation of

Walker's constitutional rights." (Suppl. Compl. ¶ 249). She also appears to assert that the history of "widespread inmate-on-inmate abuse and violence" put the Sheriff on notice of the need to ensure the detention units were adequately staffed. (*Id.* ¶¶ 245-48). The Court finds that, under the facts alleged, the Sheriff had a practice of assigning only one detention officer to a housing unit even though he admitted that "three officers who constantly move through the six housing zones" is the ideal staffing level. (*Id.* ¶¶ 204-05). She further alleges that the Sheriff was aware that, with only one officer assigned to a housing unit, if that officer left to attend to other matters, "nearly 200 out of cell detainees in the housing zones, including on 7-North," would be left unattended." (*Id.* ¶ 256). And she alleges that the Sheriff was "in charge of the Jail [and] Jail staff." (Suppl. Compl. ¶ 8). The problem with the Plaintiff's argument is that she alleged (and the Court found) that Officer Muhammad's act of leaving 7North unattended is what constituted deliberate indifference to Walker's rights, not the fact that Officer Muhammad was the sole detention officer assigned to that unit. And the Sheriff's alleged custom of regularly staffing the housing units with one detention officer is not facially unconstitutional; nor does the Plaintiff allege that it is. Thus, the Plaintiff has to show that the Sheriff was aware that this staffing practice regularly resulted in detention officers leaving the housing units unattended. *See Goebert*, 510 F.3d at 1332 ("[S]upervisory liability for deliberate indifference based on the

implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations.). But the Plaintiff does not allege that detention officers were regularly forced to leave their housing units unattended—in fact, she does not identify any other instance where, as a result of the Sheriff's alleged practice of assigning only one detention officer to a housing unit, a detention officer left his assigned housing unit unattended. Thus, the Plaintiff cannot establish a causal connection sufficient to overcome qualified immunity on this basis.

The Plaintiff's widespread abuse argument also fails. Again, this supervisory liability claim against the Sheriff hinges on Officer Muhammad's act of leaving 7North unattended. That is the act that the Court found constituted deliberate indifference to Walker's constitutional right to reasonable safety. While widespread inmate-on-inmate violence in the jail is certainly a serious problem under the facts alleged, the Plaintiff does not explain how the existence of widespread violence would have put the Sheriff on notice that Officer Muhammad (or any detention officer) might leave 7North unattended. *See Harrison*, 746 F.3d at 1298 (holding that to hold a supervisor liable, the plaintiff must establish that the widespread abuse "puts the responsible supervisor on notice of the need to correct the alleged deprivation"). And to the extent the Plaintiff alleges that the Sheriff's custom of understaffing

37

the housing units was itself a widespread abuse that resulted in Officer Muhammad's actions, the Plaintiff has failed to show that the staffing decision resulted in a "flagrant, persistent pattern" of detention officers leaving their housing units unattended. *See id.* at 1301. This is because the Plaintiff has not identified any other instances of a detention officer leaving his assigned housing unit unattended as a result of understaffing.

For these reasons, the Plaintiff has not met the extremely rigorous standard of demonstrating a plausible causal connection between any action or inaction of the Sheriff and Officer Muhammad's actions. *Stalley*, 124 F.4th at 1288. Accordingly, the Sheriff is entitled to qualified immunity for the alleged deliberate indifference of Officer Muhammad. *Harrison*, 746 F.3d at 1298 (holding that to hold a supervisor liable for the unconstitutional acts of his subordinates, a plaintiff must demonstrate a causal connection between the supervisor's actions and the alleged constitutional violation); *Gates*, 884 F.3d at 1296 (holding that to overcome qualified immunity, the plaintiff must show that the facts alleged make out a constitutional violation). The Sheriff's Motion to Dismiss [Doc. 24] will be granted as to Count V.

### iii. Supervisory Liability of Correctional Officers for Alleged Failure to Relocate Walker in April 2022 – Count VI

The Plaintiff asserts a second supervisory liability claim against the Sheriff on the grounds that jail staff failed to relocate Walker from 7North after he was attacked by another inmate in April 2022. (Suppl. Compl. ¶¶ 262-68).

The Sheriff contends that the Plaintiff has failed to establish a widespread abuse regarding failure to transfer inmates who have been attacked such that he cannot be held liable for any failure to transfer Walker. (Sheriff's Mot. to Dismiss, at 10-11).

As an initial matter, the Plaintiff has not alleged any facts supporting the existence of a custom or policy of failing to transfer inmates who have been attacked, nor are there allegations that the Sheriff directed subordinates not to transfer Walker after the attack. Thus, only the first avenue of establishing a causal connection is at issue. The Court agrees with the Sheriff that the Plaintiff has failed to allege facts presenting a widespread abuse with regard to failing to transfer inmates. First, as the Sheriff points out, the Plaintiff does not allege that Walker ever requested to be transferred after he was attacked. Nor does the Plaintiff allege another incident where an inmate was attacked at the jail and was not transferred away from his or her attacker. The Plaintiff argues in response that her allegations of severe overcrowding and systemic violence bridge the causal connection gap and that the widespread abuse here "was the Sheriff squandering funds that could have been used to hire staff." (Pl.'s Resp. in Opp. to Sheriff's Mot. to Dismiss, at 7). But the alleged deprivation at issue here was the jail staff's failure to transfer Walker, not the generalized existence of unsafe conditions inside the jail. And without allegations that other inmates were attacked and not subsequently

transferred, the facts here indicate that any failure to transfer Walker was an "isolated occurrence" rather than another instance in an "obvious" or "flagrant" history of constitutional violations. *See Harrison*, 746 F.3d at 1298. Nor has the Plaintiff explained how the Sheriff's misuse of funds, which she alleges is the widespread abuse at issue, caused the alleged failure to transfer Walker after he was attacked. Therefore, because the Plaintiff has not adequately alleged a causal connection between the Sheriff's actions and the failure to transfer Walker, the Sheriff is entitled to qualified immunity on this claim. *Harrison*, 746 F.3d at 1298; *Gates*, 884 F.3d at 1296. The Motion to Dismiss [Doc. 24] will be granted as to Count VI.

### iv.  Damages

Because the Plaintiff's substantive claims against the Sheriff under § 1983 are barred, her corresponding punitive damages claim against him is due to be dismissed as well. *See Wright v. Sheppard*, 919 F.2d 665, 671 (11th Cir. 1990) (noting that punitive damages may be imposed in § 1983 cases only if the defendant "has acted willfully and with gross disregard for the plaintiff's rights."). Because qualified immunity bars the Plaintiff's substantive claims against the Sheriff, she necessarily fails to show that this standard has been met.

With regard to the Plaintiff's claim for wrongful death damages, the Sheriff asserted the same argument as the County that the ante litem notice

requirement in O.C.G.A. § 36-11-1 was not met here. For the same reasons as explained *supra*, Section II. B. a. ii., that argument fails because the ante litem notice here was timely. The Sheriff also asserts that he is entitled to official immunity under Georgia law as to this claim. Under Georgia law, official immunity protects "public officers and employees for discretionary actions taken within the scope of their official authority, and done without willfulness, malice or corruption." *Hall v. Acker*, 367 Ga. App. 411, 414 (2023). The Sheriff argues that all of the actions the Plaintiff challenges were discretionary actions because they were undertaken as part of his official duties as Sheriff. (Sheriff's Mot. to Dismiss, at 17-18). The Plaintiff does not raise any argument against the application of official immunity. (See generally Pl.'s Resp. in Opp. to Sheriff's Mot. to Dismiss). Accordingly, the Court finds the Sheriff is entitled to official immunity against the Plaintiff's claim for wrongful death damages, so the Sheriff's Motion to Dismiss [Doc. 24] will be granted as to the Plaintiff's damages claims.

### III. Conclusion

For the foregoing reasons, the Defendant Fulton County's Motion to Dismiss [Doc. 22] is GRANTED; the Defendant Curt Muhammad's Motion to Dismiss [Doc. 23] is GRANTED in part and DENIED in part; and the Defendant Patrick Labat's Motion to Dismiss [Doc. 24] is GRANTED. The Plaintiff's Motions to Supplement and for Clarification [Docs. 36, 37] are

GRANTED. The Plaintiff's Motion to Take Judicial Notice [Doc. 45] is GRANTED in part and DENIED in part. The Clerk is directed to docket the Plaintiff's Supplemental Complaint [Doc. 36].

SO ORDERED, this ____28th____ day of August, 2025.

THOMAS W. THRASH, JR.
United States District Judge