EXHIBIT "D"

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **TAMARRA E. STUPPARD-WILSON**, as Administratrix of the Estate of **DINO VANDARREL WALKER,** Deceased**,** | **JURY TRIAL DEMANDED** |
| **Plaintiff**, | CIVIL ACTION FILE NO. 1:24-cv-03400-TWT |
| **v.** | |
| **FULTON COUNTY, GEORGIA**, a political subdivision of the State of Georgia, **SHERIFF PATRICK LABAT,** in his individual capacity, and **CURT MUHAMMAD**, individually, | |
| **Defendants**. | |

## SUPPLEMENT TO FIRST AMENDED COMPLAINT FOR DAMAGES

TAMARRA E. STUPPARD-WILSON, as Administratrix of the Estate of Dino Vandarrel Walker ("Plaintiff"), and pursuant to Federal Rule of Civil Procedure 15(d) files this Proposed Supplement to her First Amended Complaint for Damages against the Defendants, showing this Honorable Court as follows:

## INTRODUCTION

1.

This civil action is brought under 42 U.S.C. § 1983 for the September 22,

2022 wrongful death of Dino V. Walker in the Fulton County Jail. Plaintiff alleges that Detention Officer Curt Muhammad and others were deliberately indifferent to a known risk of serious harm to Walker, a pre-trial detainee, when Defendant Muhammad left Walker unsupervised in a high-risk area of the jail for approximately one hour, when Walker was stabbed and killed by an unattended inmate.

<div align="center">JURISDICTION</div>

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the Fourteenth Amendment of the United States Constitution. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

<div align="center">2.</div>

All parties are subject to the jurisdiction of this Court.

<div align="center">VENUE</div>

<div align="center">3.</div>

All acts or omissions alleged in this complaint occurred in the Northern District of Georgia, where at least one defendant resides, and therefore venue is properly within this district under 28 U.S.C. § 1391(b)(2).

<div align="center">PARTIES</div>

<div align="center">4.</div>

Plaintiff Tamarra E. Stuppard-Wilson ("Plaintiff") is the Administrator of the

Estate of Dino V. Walker, deceased. She is a resident of Georgia. As personal representative of Walker's estate, she is the proper person to bring an action to recover compensation for Walker's death, pain and suffering, for punitive damages, and for funeral/burial, medical and other necessary expenses.

<u>Dino Walker</u>

5.

Dino Walker was a citizen and resident of Georgia. He was thirty-three (33) years old at the time of his death.

<u>Defendant Fulton County, Georgia</u>

6.

Defendant Fulton County is a governmental entity and political subdivision of the State of Georgia and thus constitutes a state actor. Through its Board of Commissioners, Defendant Fulton County provides funding for the operation of the Fulton County Jail.

7.

Defendant Fulton County may be served with process through the Chairperson of its Board of Commissioners, Rob Pitts, at 141 Pryor Street SW, 10th Floor, Atlanta, GA 30303. Defendant Fulton County is subject to the jurisdiction of the Court and venue is proper.

<u>Defendant Sheriff Patrick Labat</u>

Defendant Sheriff Patrick Labat is a citizen of Georgia and resides within the Northern District of Georgia. Defendant Labat may be served with process at 185 Central Avenue SW, 9th Floor, Atlanta, Georgia 30303. Defendant Labat is subject to the jurisdiction of this Court and venue is proper.

8.

At all times relevant to this action, Defendant Patrick Labat was the duly elected Sheriff of Fulton County, Georgia ("Defendant Labat"). Defendant Labat was responsible for the day-to-day operations of the Fulton County Sheriff's Office, including the Fulton County Jail. Defendant Labat was responsible for ensuring and maintaining the physical safety and welfare of detainees at the Fulton County Jail. In his capacity as Sheriff, Defendant Labat had custody, control, and was in charge of the Jail, Jail staff, and the detainees/inmates populating the Jail.

9.

At all-time relevant to this action, Defendant Labat acted under the color of state law. Defendant Labat is being sued for damages in his individual capacity.

Defendant Curt Muhammad

10.

Defendant Curt Muhammad ("Defendant Muhammad"), at the time of the events described in this complaint, held the position of Detention Officer at the Fulton County Jail. Upon information and belief, Defendant Muhammad is a citizen

and resident of the state of Georgia, residing in the Northern District of Georgia. Defendant Muhammad may be served with process at his residence address – which is not cited in this lawsuit due to his status as a law enforcement officer. Defendant Muhammad is sued in his individual capacity and is subject to the jurisdiction of this Court. In his capacity, Defendant Muhammad held the responsibility of monitoring inmates, securing detention facilities, and maintaining the physical safety and security of inmates, including that of decedent Dino Walker.

<u>Additional Defendants</u>

11.

Plaintiff plans to uncover further defendants whose deliberate indifference played a role in the tragic death of Walker. This may include, among others, deputies or jailers accountable for the absence of supervision when Walker and the inmate who caused his death were left unattended.

12.

At all times relevant herein, the defendants acted under color and authority of state law for purposes of the federal constitutional claims against them.

<u>Presentation of Claims</u>

13.

On September 21, 2023, Plaintiff presented its claims (detailed below) via FedEx standard overnight delivery to Defendants Fulton County and Sheriff Labat,

providing an additional copy to the Fulton County Attorney, as contemplated under O.C.G.A. § 36-11-1. The Presentation of Claims is attached hereto as Exhibit A. The FedEx Slips with the corresponding proofs of delivery are attached hereto as Exhibits B and C.

<p style="text-align: center;">FACTS</p>

<p style="text-align: center;">The Fulton County Jail</p>

<p style="text-align: center;">14.</p>

On September 22, 2022 Dino Walker was a detainee at the Fulton County Jail. On that date he was fatally stabbed with an apparent makeshift knife or shank by another detainee.

<p style="text-align: center;">15.</p>

Makeshift knives or shanks made by detainees have long been a well-known and well-documented problem at the Fulton County Jail, resulting in violent attacks, severe injuries, and deaths.

<p style="text-align: center;">16.</p>

For example, on or about April 20, 2022 a sweep of the Fulton County Jail resulted in the discovery of nearly one hundred knives or shanks.

<p style="text-align: center;">17.</p>

Less than one year later, in March 2023, a search of only one third of the housing zones in the Jail uncovered more than two hundred homemade

knives/shanks.

18.

By the time of the mid-March 2023 search, there had been seventy-eight stabbings at the jail in 2023, more than one per day.

19.

With an inmate population then ranging between 3,200 and 3,400 this means that by the end of 2023, more than ten percent of the inmate population would have become stabbing victims.

20.

In a dramatic and well-publicized appearance before the Atlanta City Council on October 3, 2022 Defendant Labat had a Jail guard roll a wheelbarrow full of knives/shanks confiscated from the Fulton County Jail into the Atlanta City Council Chambers.

21.

During that October 3, 2022 meeting before the Atlanta City Council Defendant Labat made reference to the stabbing death of Dino Walker, that had occurred just days earlier.

22.

At the time of the October 3, 2022 meeting, the Jail was so overcrowded that its floors, on average, were lined with five hundred (500) doggie trays to house

detainees for whom there was no room inside a cell.

23.

Alton Adams, Fulton County's Chief Operating Officer for Justice, Public Safety and Technology (appointed in December 2021), said at the Fulton County Board of Commissioners meeting on July 10, 2023 that, in all, Fulton County has an average weekly jail population of about 3,600 people. The Jail was built to hold up to 1,125 individuals.

24.

In 2023, the Sheriff's General Counsel, Amelia Joyner, told a panel of Georgia State Legislators investigating the jail that overcrowding strains the physical limits of the aging jail and contributes to the violence.

25.

In the first ten months of 2023, the Fulton County Jail recorded approximately 293 stabbings, 337 fights, 922 assaults, and more than 1,186 confiscated knives/shanks.

26.

Two years earlier, during the fall of 2021, Defendant Labat had given the Fulton County Commissioners a tour of the Fulton County Jail. The tour allowed the Commissioners to observe firsthand the deteriorating infrastructure and conditions at the Fulton County Jail that contributed to the violent and dangerous atmosphere

there.

27.

Defendant Labat has explained to the Fulton County Commission and to the general public on multiple occasions (including in 2021, 2022, and 2023) why there is such a proliferation of homemade knives and shanks at the Fulton County Jail. Detainees at the Jail fashion metallic weapons from the crumbling physical infrastructure of the Jail.

28.

In a September 20, 2023 meeting before the Fulton County Commission, Defendant Labat brought several inmates of the Fulton County Jail to speak directly to the Fulton County Board of Commissioners.

29.

"The jail itself is deteriorating," inmate Kenneth Perry Jr. said. "The walls are crumbling down, and inmates are creating shanks out of the walls."

30.

According to an Atlanta Journal Constitution investigation, more than sixty people who were held in the Fulton County Jail died between 2009 and October 2022, the highest total of any jail in Georgia during that time.

31.

According to the Fulton County Sheriff's Office, from January 2021 to December 2022, deaths at the Fulton County Jail quadrupled.

32.

The Jail's reputation as one of the most dangerous jails in the country has become so infamous that it prompted the United States Department of Justice ("DOJ") to launch an investigation on July 13, 2023, into both the Fulton County Jail and Fulton County.

33.

Summarizing the reasons for the DOJ investigation, Attorney General Merrick B. Garland stated, "We launched this investigation into the Fulton County Jail based on serious allegations of unsafe, unsanitary living conditions at the jail, excessive force and violence within the jail, discrimination against incarcerated individuals with mental health issues, and failure to provide adequate medical care to incarcerated individuals."

34.

The Department of Justice investigation was premised in part on the Civil Rights of Institutionalized Persons Act — a federal law that authorizes the Department of Justice to investigate state institutions, including county jails, to

determine whether incarcerated people are subjected to a pattern or practice of constitutional violations.

35.

According to Assistant Attorney General Kristin Clarke, the DOJ's ongoing investigation of the Fulton County Jail revealed that at one point in 2022, more than two hundred weapons were discovered during a sweep of the main jail.

36.

DOJ investigators have reported credible allegations that inmates of the jail are housed in a facility considered "structurally unsafe," and that correctional officers are using excessive force, and that violence is widespread, resulting in serious injuries and even murders.

37.

Ryan Buchanan, United States Attorney for the Northern District of Georgia, joined Attorney General Garland, providing his view of the justification for the DOJ investigation, stating, "The recent allegations of filthy housing teeming with insects, rampant violence resulting in death and injuries, and officers using excessive force are cause for grave concern and warrant a thorough investigation."

38.

Condemning the Fulton County Jail, in particular, Assistant Attorney General Kristen Clarke said, "The unconstitutional conditions that we see too often inside

jails and prisons have no place in society today."

39.

"Our investigation into these matters is guided by one core principle: People held in jails and prisons do not surrender their constitutional and civil rights at the jailhouse door," Clarke said.

40.

According to Clarke, 87% of the jail population in Fulton County is Black and the vast majority have not been convicted. They are awaiting bail hearings, competency evaluations and restoration services or are detained because of their inability to post bail.

41.

Defendant Labat has publicly admitted that he lacks the resources to carry out his legally mandated responsibility to protect the constitutional rights of detainees at the Fulton County Jail.

42.

On July 21, 2023 representatives of the National Institute of Corrections (NIC) of the U.S. Department of Justice and the Bureau of Judicial Assistance

conducted a site visit to the Fulton County Jail. Among other actions, these representatives met with Defendant Labat.

43.

Defendant Labat informed the NIC and BJA representatives that during his term thousands of homemade knives made of materials from the deteriorating facility had been confiscated at the Jail.

44.

Defendant Labat also informed the NIC and BJA representatives that detainees often fashion weapons when they do not feel safe.

45.

The proliferation of knives/shanks and stabbings at the Fulton County Jail continues unabated. In a mid-July 2024 news conference, Defendant Labat stated that since June 1, 2024 there had been ten stabbings at the Jail and that seventy-five (75) knives/shanks had been confiscated.

THE FIRST KNIFE ATTACK ON DINO WALKER

46.

On December 7, 2020, Walker entered the Fulton County Jail (located at 901 Rice St. NW, Atlanta, GA 30318) as a pretrial detainee. Walker remained a pretrial

detainee in the Fulton County Jail up until the time of his death there on September 22, 2022.

<div align="center">47.</div>

In April 2022, Walker was attacked in the Fulton County Jail by multiple inmates. This attack was ordered by a gang known as "Slime."

<div align="center">48.</div>

While Walker was being attacked, Walker was fighting back and yelling while making his way to an area known as the "red zone" where more officers could see Walker, with the hope of increasing his chances of surviving the attack. Jail officials were aware of this attack on Walker.

<div align="center">49.</div>

Walker was not taken, though he should have been taken, for medical treatment after the April 2022 attack.

<div align="center">50.</div>

Walker remained housed in the area of the Jail known as 7North, even after the April 2022 attack, keeping him on the same floor and in close proximity to violent, dangerous inmates who were affiliated with groups that had shown increasing hostility toward Walker.

<div align="center">51.</div>

Defendant Labat and Defendant Muhammad, along with other Sheriff's

<div align="center">14</div>

Office employees, had actual knowledge of the April 2022 attack on Walker.

<u>THE FATAL KNIFE ATTACK OF DINO WALKER</u>

52.

On September 22, 2022, Walker was being housed on the floor designated "7North."

53.

7North houses the jail's most dangerous detainees/inmates.

54.

On September 22, 2022, Defendant Muhammad was assigned to 7North for a 7:00 p.m. to 7:00 a.m. shift.

55.

Under the Fulton County Sheriff's Office policy, among the responsibilities of a detention officer during his or her shift is to "[c]onduct a personal visual well-being check of all inmates at least every 30 minutes (every 15 minutes for special classification inmates)."  FCSO Jail Operations Post Order No. 24 (8/31/2022), § IV(B)(3).

56.

Under the Fulton County Sheriff's Office policy, another responsibility of a detention officer during his or her shift is to conduct security rounds "once per hour

in all housing units with the exception of Medical, Administrative, and/or Segregation Zones (security rounds are to be conducted every thirty (30) minutes/twice (2) per hour. Medical Unit Security Rounds for inmates on suicide watch will be conducted every fifteen (15) minutes.)"  FCSO Jail Operations Post Order, No. 24 (8/31/2022), § IV(B)(1).

57.

On September 22, 2022, at approximately 8:35 p.m., Defendant Muhammad abandoned his post, leaving the inmates of 7North out of their cells and unattended.

58.

At approximately 9:00 p.m. that day, the unattended inmates informed Tower Officer Tamesha Dodson ("DO Dodson"), via intercom, that Walker was unresponsive on the Day Room floor in a pool of blood.

59.

The inmate who fatally stabbed Walker was Garfield Sewell, a pre-trial detainee being held to stand trial for a murder that occurred almost two years before this incident.

60.

DO Dodson radioed Defendant Muhammad, instructing him to return to his post.

61.

Defendant Muhammad responded with, "Stand by."

62.

At approximately 9:16 p.m., DO Hugger left his post at 7South in order to assist 7-North in monitoring the unattended inmates.

63.

Upon his arrival at 7-North, DO Hugger observed that Walker was lying on the floor face down, motionless, in a pool of blood.

64.

DO Hugger asked DO Dodson to call for a stretcher.

65.

At approximately 9:31 p.m., a medical provider, PA Morals, arrived and examined Walker, checking for a pulse.

66.

PA Morals asked DO Hugger to call EMS and stated that there was no need to conduct CPR because Walker had been dead for some time.

67.

DO Hugger radioed the tower officer on 7North to call EMS, but was told to stand down by Captain Johnson.

68.

Defendant Muhammad arrived back to 7-North around 9:15 p.m., one hour after leaving his post unattended.

69.

Had Defendant Muhammad remained at his assigned post, conducted his security rounds as required by the Sheriff's Office policy, or conducted visual well-being checks of all the inmates under his watch as required by the Sheriff's Office policy, Defendant Muhammad either (a) would have prevented Walker's attack because of his presence on 7North or (b) at least would have been present when Walker was found unresponsive making it possible to get medical help more quickly and perhaps save Walker's life.

70.

Grady EMS arrived on the floor at 10:05 p.m.

71.

Dr. Lindsey, of Grady Memorial Hospital, pronounced Walker dead at 10:12 p.m.

## THE DEPARTMENT OF JUSTICE REPORT OF ITS INVESTIGATIVE FINDINGS ON FULTON COUNTY, THE FULTON COUNTY SHERIFF, AND THE FULTON COUNTY JAIL

72.

On July 13, 2023, the United States Department of Justice ("DOJ") announced it was initiating a civil investigation into Fulton County and the Fulton County Sheriff's Office, focusing on the Fulton County Jail ("civil investigation").

73.

On November 14, 2024 the DOJ held a press conference announcing the conclusion of its civil investigation and its release of a report chronicling its investigation and accompanying findings ("DOJ Report").

74.

The DOJ Report is a public document available on the website of the U.S. Department of Justice's Civil Rights Division's website.

75.

The information contained in this Section of the Complaint, except where otherwise expressly indicated, is taken from the DOJ Report.[1]

---

[1] References to page numbers in this Section of the Complaint refer to the page number in the DOJ Report that contains the factual statement in each paragraph.

76.

Fulton County Jail is the secure detention facility for people awaiting resolution of criminal charges in Fulton County. (page 1)

77.

The entities responsible for the Jail are the Fulton County Sheriff's Office, which operates the Jail, and Fulton County, which funds the Jail. (page 1)

78.

Through the Board of Commissioners, Defendant Fulton County provides funding for the Jail and maintains the Jail facilities. (page 1)

79.

The DOJ Report is unique in its presentation as it as it sets forth detailed facts about the existence and causes of violence at the Fulton County Jail, including the roles played by Fulton County and the Fulton County Sheriff's Office and "describes the constitutional and statutory violations that [the DOJ] found in the Jail, including the legal framework applied." (Page vii)

80.

Throughout the DOJ Report are references to the U.S. Constitution, federal statutory law, federal case law citations, Fulton County Sheriff's Office policies,

Fulton County Government Guidebook, U.S. Attorney press releases, meetings of the Fulton County Board of Commissioners, and other documenting sources.

81.

The DOJ investigation of the Fulton County Jail involved multiple tours of the Jail by DOJ investigators, DOJ attorneys, and corrections experts, allowing for firsthand observation of the issues addressed in its Report. (Page 4)

82.

The DOJ investigative team was able to interview current and former jail staff, as well as incarcerated and recently incarcerated people and their family members; observe Fulton County Board of Commissioners' Meetings at which measures relating to the Jail were discussed; and engage in extensive document review (including Jail records). Additionally, the DOJ investigative team met with organizations that advocate for the incarcerated population. (Pages 4 – 5)

83.

After an extensive investigation the DOJ found "reasonable cause to believe that Fulton County and the Fulton County Sheriff's Officer violate the constitutional and statutory rights of people incarcerated in the Fulton County Jail." (Page 7)

84.

The DOJ also found that the Fulton County Jail "fails to adequately protect incarcerated people from the substantial risk of serious harm from violence, including homicides and stabbings by other incarcerated people." (Page 7)

85.

Killings, stabbings, and assaults are common in the Fulton County Jail. (Page 8)

86.

Assaults and stabbings with man-made shanks are a feature of life at the Jail. (Page 9)

87.

Fulton County and the Fulton County Sheriff's Office have not taken adequate measures to maintain the Jail facilities. (Page 22)

88.

Due to poor maintenance and inadequate supervision, the Jail itself is a source of dangerous weapons and exposes incarcerated people to violence. (Page 22)

89.

The Fulton County Sheriff's Officer reported confiscating 2,157 man-made
sharpened weapons in 2023 and 1,370 such weapons in 2022, the year Dino Walker
was killed in a knife attack. (Page 24)

90.

The number of weapons confiscated at the Fulton County Jail is "much greater
than should be expected in a correctional facility of its size." (Page 24)

91.

For example, the Miami-Dade County Jails have a population roughly 1.5
times the population of the Fulton County Jail, but in 2023 staff confiscated 346
weapons and 519 in 2022. (Page 24)

92.

Door locks throughout the main section of the Fulton County Jail do not work.
(Page 25)

93.

Even in areas with sliding cell doors, it has long been well-documented that
incarcerated persons manipulate the manual override mechanism that controls the
cell doors in a zone. (Page 25)

94.

The failure to provide secure cell doors and keep door locks in good repair is the product of inattention. (Page 26)

95.

Due to inadequate supervision and the poor condition of the Jail, incarcerated persons were able to create large holes in the walls of the Jail through which they are able to travel to various parts of the Jail and cause harm to others. (Page 26)

96.

By burning holes through windows, incarcerated persons at the Jail are receiving contraband via drone. (Page 28)

97.

Poor security practices contribute to the large amounts of contraband in the Jail. (Page 28)

98.

Jail staff do not conduct adequate or frequent enough security checks to identify and remove contraband. (Page 28)

99.

According to the DOJ Report, Jail staff appear "apathetic" toward the security problem. (Page 28)

100.

Further, according to the DOJ Report, corrupt staff are also a significant source of contraband inside the Jail. (Page 29)

101.

Poor supervision, poor classification practices, and inattention to maintenance of the Jail are all major contributors to the violence at the Jail. (Page vii)

102.

The Fulton County Jail has inadequate systems for identifying, investigating, and preventing violence inside the Jail. (Page 29)

103.

There was widespread awareness of these issues, including by Defendant Fulton County and Defendant Sheriff Labat. (Page vii)

104.

Despite widespread awareness of these issues by Defendant Fulton County and Defendant Sheriff Labat, these issues have persisted. (Page vii)

105.

Fulton County and the Fulton County Sheriff's Office have not taken adequate measures to maintain the Jail facilities, and combined with poor supervision, jail maintenance, and poor security practices, contribute to a large amount of contraband, including weapons and drugs, and unsafe facilities. (Page 22)

106.

Jail leadership [including Defendant Fulton County and Defendant Sheriff Labat] is aware of the danger Jail conditions pose to incarcerated persons but has failed to take adequate action to make the facility safe. (Page 22)

107.

The Fulton County Jail has far more stabbings of incarcerated people than do much larger facilities, including New York City (1.5 times greater) and Miami (27 times greater). (Page 9)

108.

The DOJ believes that despite the high rate of violence within the Fulton County Jail that Sheriff's Office data does not accurately capture the true extent of the violence inside the Jail. (Page 11)

109.

The Fulton County Jail regularly operates without enough staff to provide appropriate supervision and prevent violence. (Page 19)

110.

Fulton County Jail staff are rarely present in the housing units of the Jail. (Page 19)

111.

Fulton County Jail staff do not perform adequate security rounds in the housing units of the Jail. (Page 19)

112.

Fulton County Jail staff do not adequately monitor incarcerated people to prevent harm. (Page 19)

113.

Fulton County Jail staff often fail to intervene to stop violence between incarcerated people. (Page 19)

114.

Fulton County Jail staff often fail to promptly respond to violent incidents. (Page 19)

115.

Violence at the Fulton County Jail occurs as a direct result of the understaffing. (Page 20)

116.

The DOJ Report suggests that inadequate staffing provided an opportunity for the fatal knife assault on Dino Walker.

117.

While there was an officer apparently present in the tower at the time [Defendant Muhammad] left the 7-North housing unit unsupervised, the tower guard cannot see all areas of the housing unit from the tower, including inside the cells. (Pages 20-21)

118.

Due to [Sheriff Labatt's] misuse of the Inmate Welfare Fund, the Fulton County Board of Commissioners closed the Fund, taking away the Sheriff's Office direct access to millions of dollars in funds designated for inmate welfare. (Page 4)

119.

(This paragraph is not in the DOJ Report) [While the information contained in this paragraph does not appear in the DOJ Report, Fulton County Ordinances

created a three-person committee to oversee the Inmate Welfare Fund composed of the Chairman of the Fulton County Commission, the Fulton County Sheriff, and the Chief Jailer for the Fulton County Jail. It is undisputed that this committee never once met in 2021, 2022, or 2023. In fact, both the Chairman of the Fulton County Board of Commissioners (Rob Pitts) and Sheriff Labat both publicly stated that they were unaware of the law establishing the committee or of the committee's legally mandated oversight responsibilities to ensure that the Inmate Welfare Fund resources were used exclusively for inmate welfare. Examples of the misuse of the Inmate Welfare Fund resources are set forth in the Plaintiff's First Amended Complaint [Doc. 20 at ¶120]].

120.

Defendant Fulton County and the Defendant Fulton County Sheriff violate the constitutional and statutory rights of people confined at the Fulton County Jail by, with deliberate indifference to the risks of harm, (1) failing to protect incarcerated people from violence and (2) failing to provide humane living conditions. (Page 97)

DOJ REPORT'S REFERENCES TO DINO WALKER

121.

The DOJ Report does not mention Dino Walker by name; however, it refers to him and/or the circumstances of his death at least three times in specific enough terms so it is apparent he is the person being discussed. (Pages 9, 20, and 62)

122.

At page 9 of the DOJ Report, Dino Walker is first identified as follows: "In September 2022, a 33-year-old man died after being stabbed by another incarcerated person. The victim had a stab wound between his shoulder and neck and a deep gaping wound above is eyebrow." This Section of the DOJ Report is titled "The Jail exposes incarcerated people to extreme violence and the risk of serious harm."

123.

The second reference to Dino Walker appears at page 20 of the DOJ Report and states: "Similarly, the September 2022 homicide occurred when the floor officer left his assigned unit of around 100 [one hundred] incarcerated people to deliver paperwork and exchange his Taser cartridge. While he was gone, incarcerated people alerted the tower officer that someone was 'laid out on the floor.' The tower officer called the floor officer assigned to another unit to respond. When that officer arrived, the victim was face down in a puddle of blood with no signs of movement." This Section of the DOJ Report is titled: "The Jail does not provide adequate staffing and supervision to keep people safe."

124.

The third and final reference to Dino Walker appears at page 62 of the DOJ Report, stating: "Two officers who responded to the homicide in September 2022 can be seen on surveillance video standing around while the victim was on the ground, unresponsive."

125.

(This paragraph is not in the DOJ Report) - Each of the three references to Dino Walker in the DOJ Report implicates the following counts of the Plaintiff's First Amended Complaint: Count I against Defendant Fulton County (Monell liability); Count II against Defendant Labat (deliberate indifference to risk of serious harm); Count III against Defendant Muhammad (deliberate indifference to risk of serious harm); Count IV against Defendant Muhammad (violation of ministerial duties); Count V against Defendant Labat (supervisory liability for Defendant Muhammad's failure to perform visual well-being checks); Count VI against Defendant Labat (supervisory liability for failure to relocate Dino Walker); Wrongful death damages against Defendants Fulton County, Sheriff Labat, and Muhammad; and Punitive Damages against Defendants Labat and Muhammad.

## COUNT I

### DEFENDANT FULTON COUNTY

31

<u>42 U.S.C. § 1983; Fourteenth Amendment</u>

<u>Monell Liability</u>

126.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 125 above as if fully restated herein.

127.

Dino Walker, as a pretrial detainee, was entitled to the protection of his constitutional rights under the Fourteenth Amendment, including protection from deliberate indifference by Defendant Fulton County to his safety and well-being.

128.

This private cause of action against Defendant Fulton County is based on the U.S. Supreme Court's holding in <u>Monell v. Dep't of Social Services</u>, <u>436 U.S. 658, 691</u> (1978), where the Court held that a state actor can be liable under <u>42 U.S.C. § 1983</u> "when execution of a government's policy or custom is responsible for the alleged deprivation of civil rights."

129.

"In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice," <u>McDowell v. Brown, 392 F.3d 1283, 1290</u> (11th Cir. 2004).

130.

A policy is a statement or other decision "officially adopted and promulgated by a government or its officers, while a custom receives no such formal approval through … official decision-making channels," Monell, 436 U.S. at 690-691. A custom, rather, is "a practice that is so settled and permanent that it takes on the force of law," McDowell v. Brown, 392 F.3d at 1290.

131.

For purposes of Monell liability and the allegations asserted herein, Fulton County, Georgia is a state actor.

132.

To allege a viable Monell claim the Plaintiff must show (a) violation of a constitutional right; (b) that the governmental entity had a custom or policy that constituted deliberate indifference to that constitutional right; and (c) that the policy or custom caused the violation.

133.

Though the Sheriff operates the Fulton County Jail, Defendant Fulton County, through its Board of Commissioners, provides funding for the Jail's operations.

134.

As asserted herein, Defendant Labat made repeated funding requests to the Commissioners of Defendant Fulton County to address the Jail's crumbling

infrastructure that detainees were using to fashion knives and shanks that were ultimately used to injure or kill other inmates.

135.

In 2021, nearly a year before Dino Walker was killed, Defendant Labat took Fulton County's Commissioners on a tour of the deteriorating Jail so they could see for themselves how detainees could use the Jail's crumbling infrastructure to fashion weapons.

136.

Defendant Fulton County's Commissioners were able to see firsthand that the Jail's crumbling infrastructure provided an almost inexhaustible supply of materials from which knives/shanks could be fashioned.

137.

Not only were Defendant Fulton County's Commissioners able to view the Jail for themselves, but throughout 2021, 2022, and 2023 they were repeatedly presented with statistics (through both the Defendant Sheriff and the local media) concerning violence at the Jail, the number of knives/shanks confiscated in the Jail, overcrowding at the Jail, understaffing at the Jail, the deplorable physical condition of the Jail, and the number of inmates injured or killed in knife attacks at the Jail.

138.

By not providing the requested funding to address the crumbling

infrastructure from which weapons were made, Defendant Fulton County virtually assured that the violence at the Jail would continue, that knives and shanks would continue to be fashioned in alarming numbers from the Jail's infrastructure, and that detainees at the Jail would continue to be victimized by knife violence.

139.

In January 2021, Defendant Labat told the Fulton County Commission that without additional funding or space he would be unable to fulfill his constitutional obligations to detainees at the Jail.

140.

Defendant Fulton County, through its Commissioners, had known for years prior to Dino Walker's death that the Jail was seriously overcrowded, seriously understaffed, and dangerous, exposing detainees like Dino Walker to life and death conditions they were powerless to remedy.

141.

In testimony given in November 2023 to a Georgia Senate panel investigating the Fulton County Jail, the Sheriff's Chief Legal Counsel, Amelia Joyner, explained that the annual budget allocated by Defendant Fulton County to the Sheriff, leaves the jail generally underfunded. "We operate at a deficit," she explained.

142.

As an example of the underfunding, one of the State Senators observed that

35

the Jail's current expenses for medical care far exceeded the $36 million allocated for that category.

143.

Defendant Fulton County's budget decisions show that it had a persistent and widespread practice of underfunding the Fulton County Jail so as to deny Decedent Dino Walker's constitutional rights.

144.

Defendant Fulton County violated Dino Walker's constitutional rights by not protecting his health and safety.

145.

Defendant Fulton County knew of, through its Board of Commissioners, and disregarded an excessive risk of serious harm to Dino Walker.

146.

Defendant Fulton County, through its Board of Commissioners, was well aware of facts that suggested a substantial risk of serious harm in the Fulton County Jail existed for Dino Walker and other detainees.

147.

By virtue of the sheer number of knives/shanks in the Fulton County Jail, made from the facility's crumbling infrastructure and the sheer number of knife attacks in the Jail, combined with the violent atmosphere, overcrowding,

understaffing, and deplorable living conditions, Defendant Fulton County was aware
that Dino Walker and other detainees faced a substantial risk of serious harm.

148.

In the context of budgeting decisions, a plaintiff must show that the
constitutional violation complained of is a "highly predictable consequence" of the
budgeting practice, McDowell v. Brown, 392 F.3d at 1292.

149.

Plaintiff has alleged facts herein sufficient to identify a pattern of injuries
linked to the budgetary practices of Defendant Fulton County.

150.

A reasonable member of the Fulton County Commission would conclude,
based on firsthand information known to the Commissioners, that the budget
decisions would lead to the highly predictable consequence of the constitutional
violation at issue, i.e., failure to protect detainees'' health and safety from the
fashioning of knives/shanks from the Jail's crumbling infrastructure material and the
usage of those knives/shanks by detainees against other detainees.

151.

The Fourteenth Amendment imposes a duty on Jails to ensure detainees'
safety and well-being. Doing so, in part, in this case, required the Sheriff's
dependence on funding provided by Defendant Fulton County and its Board of

Commissioners.

152.

By not providing funding it knew to be critical to the safety and well-being of Fulton County Jail detainees Defendant Fulton County, through its Board of Commissioners, acted with deliberate indifference to the constitutional rights of detainees like Dino Walker to have their physical health and well-being protected.

153.

The funding decisions Defendant Fulton County made directly allowed the conditions to continue to exist (crumbling infrastructure, overcrowding, understaffing, deplorably unsanitary conditions) that have resulted in death and injury through knife attacks on numerous detainees at the Jail.

154.

As stated above, numerous Fulton County Jail detainees have been the victims of knife violence. For example, on June 21, 2022, barely three months before Dino Walker was killed, Anthony Jenkins, a detainee at the Fulton County Jail, was reportedly stabbed over twenty (20) times.

155.

The crumbling infrastructure of the Jail coexists with chronic unsanitary conditions, chronic overcrowding, and chronic understaffing, coalescing to make the Fulton County Jail one of the most dangerous jails in the nation for detainees.

156.

From the above allegations the Court can reasonably infer a pattern of similar constitutional violations demonstrating Defendant Fulton County's policy or custom of failing to provide for the safety and well-being of detainees by virtue of the underfunding the Fulton County Jail, constituting deliberate indifference to the constitutional rights of detainees, like Dino Walker.

157.

Defendant Fulton County's widespread and sustained practice of failing to adequately fund jail operations, including repairs to the facility's crumbling infrastructure, was the moving force that directly contributed to Dino Walker's death.

158.

Like a domino effect, Defendant Fulton County's deliberate indifference failure to adequately fund Jail operations directly led to the Jail's widespread inability to:

a.  provide for the safety and well-being of detainees, like Dino Walker

b.  provide for the repair of the crumbling Jail infrastructure from which knives and shanks are fashioned;

c.  provide for a sanitary environment for detainees, the lack of which,

according to the Department of Justice, contributes to Jail violence;

d.  provide for adequate space to prevent overcrowding, the lack of which, contributes to Jail violence; and

e.  provide for adequate staffing of the Jail, the lack of which contributes to Jail violence.

159.

As a direct and proximate result of Defendant Fulton County violating Dino Walker's Fourteenth Amendment rights, Dino Walker suffered physical injuries, pain and suffering, mental and emotional distress, and ultimately, death.

160.

As a result of Defendant Fulton County's actions and inactions, Plaintiff is entitled to compensatory damages for the loss of Dino Walker's life and damages in an amount to be proven at trial for Dino's pain and suffering.

## COUNT II:

### DEFENDANT SHERIFF PATRICK LABAT

### 42 U.S.C. § 1983: Fourteenth Amendment

### Deliberate Indifference to Risk of Serious Harm

161.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 125 above as if fully restated herein.

40

162.

Dino Walker, as a pretrial detainee, was entitled to the protection of his constitutional rights under the Fourteenth Amendment, including protection from deliberate indifference to his safety and well-being.

163.

According to the website of the Sheriff of Fulton County, one of the Sheriff's responsibilities is as a Detention Officer. The Sheriff's role in this regard is described as follows: "The sheriff is the official jailer of the county and is responsible for the health, safety, and welfare of all inmates."

164.

Since becoming Sheriff in January 2021, Defendant Labat has made numerous efforts to persuade Defendant Fulton County to increase its funding to the Sheriff's Office to alleviate serious overcrowding, to alleviate serious understaffing, to clean up the deplorably unsanitary physical condition of the Jail, and to address the crumbling infrastructure of the Jail that was frequently used by detainees to fashion knives and shanks.

165.

This lack of funding, Defendant Labat asserted, to the Fulton County Commission in January 2021, prevented him from performing his constitutional duty to protect the safety and well-being of inmates under his charge.

41

166.

While Defendant Labat was making repeated funding requests of Defendant Fulton County, he managed an Inmate Welfare Fund over which there was virtually no Fulton County oversight.

167.

Defendant Labat took office as the elected Sheriff of Fulton County, Georgia on January 1, 2021.

168.

Defendant Labat has, over a period of several years, repeatedly and vociferously decried the lack of Fulton County-allocated funds for urgent jail priorities such as inmate security, upkeep of deteriorating jail facilities, and staffing.

169.

Notwithstanding, Defendant Labat has misused millions of dollars designated by Fulton County as an Inmate Welfare Fund.

170.

By Defendant Labat's own public admission these funds, intended for inmate welfare, have repeatedly been misused, becoming the Sheriff's Office's private slush fund.

171.

Several provisions of the Fulton County Code of Ordinances are relevant to the Inmate Welfare Fund.

172.

Section 146-81 of the Fulton County Code of Ordinances provides as follows: "The sheriff is hereby authorized to establish a bank account in the name of county jail welfare fund, for recording all concession purchases, sales, and other welfare disbursements, and all funds for the welfare of persons committed to the jail shall be promptly deposited in said account, and not less than twice weekly." This Ordinance was enacted in 1983.

173.

While the heading of the above-cited County Ordinances is "County Jail Welfare Fund," this fund is commonly known as the Inmate Welfare Fund.

174.

Instead of spending the funds allocated for matters pertaining to inmate welfare, the Sheriff's Office spent the money on a host of matters unrelated to inmate welfare.

175.

Examples of these unrelated expenditures include:

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 5/26/21 | Emergency Lighting for Vehicles (HG2 Emergency Lighting) | $29,300.00 |
| 5/27/21 | Leadership Retreat (The Inn at Serenbe) | $17,491.50 |
| 6/3/21 | 2 ea, Inmate Transport Vehicles (Brannen Motor Company) | $73,900 |
| 7/7/21 | Outfit SWAT vehicle (HG2 Emergency Lighting) | $25,165.00 |
| 7/9/21 | Sheriff's Office Vehicles | $44,303.14 |
| 7/16/21 | Tents for Community Outreach (Accuwit) | $3,944.79 |
| 7/16/21 | Emergency Lighting for Sheriff Vehicles (HG2 Emergency Lighting) | $15,740.00 |
| 8/10/21 | Outfit Scorpion Team Vehicles (HG2 Emergency Lighting) | $65,771.50 |
| 8/24/21 | Leadership in Organization Training (International Assoc. of Chiefs of Police) | $52,200.00 |
| 8/24/21 | Sheriff's Office Vehicles (Legacy Ford of McDonough) | $44,303.14 |
| 8/26/21 | 9 ea., Dodge Chargers | $309,312.00 |
| 9/17/21 | Sheriff Office Vehicles (Brannen Motor Company) | $92,800.00 |
| 9/17/21 | Community Outreach Items | $10,025.76 |

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | (4imprint, Inc.) | |
| 9/21/21 | Sheriff's Office Event (Loudermilk Conference Center) | $4,200.00 |
| 9/28/21 | Mobile Radios for New Sheriff Vehicles (Motorola Solutions, Inc.) | $119,399.80 |
| 10/4/21 | DJ for Outreach Event (Christopher Douglas) | $225.00 |
| 10/22/21 | Sheriff's Office Event (Loudermilk Conference Center) | $4,200.00 |
| 1/10/22 | T&T Uniforms Extra Uniforms for Officers | $509,073.76 |
| 11/1/21 | Sheriff Staff Luncheon (Soule) | $800.00 |
| 11/22/21 | Gift Cards for Staff (The Honey Baked Ham Co.) | $39,813.43 |
| 11/30/21 | Leadership Class (Loudermilk Conference Center) | $4,200.00 |
| 11/30/21 | Lieutenants' Assessment (Loudermilk Conference Center) | $14,253.00 |
| 12/3/21 | City of South Fulton District 3 Thanksgiving Giveaway | $5,000.00 |
| 12/6/21 | Sheriff's Office Vehicles (Hardy Chevrolet Buick GMC) | $86,612.00 |
| 12/13/21 | Sheriff's Office Vehicles | $217,288.00 |

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | (Legacy Ford of McDonough) | |
| 12/14/21 | Staff Luncheon<br>(McCray's Tavern) | $2,433.32 |
| 1/4/22 | Luncheon<br>(Jason's Deli) | $229.25 |
| 1/5/22 | NIXLE Notification System<br>(Everbridge, Inc.) | $39,550.00 |
| 1/5/22 | Sergeant Assessment<br>(Loudermilk Conference Center) | $5,490.00 |
| 1/10/22 | Extra Uniforms for Officers<br>(T&T Uniforms) | $509,073.76 |
| 1/11/22 | Florist Orders<br>(Dream's Florist Designs, Inc.) | $2,601.00 |
| 1/14/22 | Vehicles for Sheriff's Office<br>(Brannen Motor Company) | $599,263.00 |
| 2/22/22 | Emergency Vehicle Package<br>(Dana Safety Supply, Inc.) | $6,064.00 |
| 3/21/22 | Admin Staff Meeting<br>(Loudermilk Conference Center) | $2,630.00 |
| 4/5/22 | Leadership Retreat – Deposit<br>(Georgia Tech Hotel & Conference Center) | $10,500.00 |
| 4/14/22 | FCSO Foundation Business Meeting<br>(The Commerce Club) | $853.90 |
| 6/15/22 | Leadership Retreat | $25,406.93 |

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | (Georgia Tech Hotel & Conference Center) | |
| 6/17/22 | Workshop Presenter – Leadership Retreat (D.E. Jackson Enterprises, LLC) | $4,000.00 |
| 6/28/22 | Women's Leadership Training (Loudermilk Conference Center) | $8,864.20 |
| 6/28/22 | IACP Leadership Training (Loudermilk Conference Center) | $4,200.00 |
| 7/22/22 | Leadership in Organization Training (International Association of Chiefs of Police) | $52,200.00 |
| 8/22/22 | Lunch for Jail Staff (Pub on Wheels) | $4,605.00 |
| 8/25/22 | Face painting booth – Employee Appreciation (Art Society) | $425.00 |
| 8/25/22 | Caricatures (Big face drawings) Big Head Cartoons | $600.00 |
| 8/25/22 | DJ Services – May 4, 2022 (HHGB Global) | $675.00 |
| 8/25/22 | DJ Services – Employee Appreciation (HHGB Global) | $1,300.00 |
| 8/25/22 | 360 Photo Booth (Jay Productions Agency) | $575.00 |
| 8/25/22 | Game Truck Employee Appreciation | $1,000.00 |

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | (Nitro Mobile Gaming LLC) | |
| 8/25/22 | Tropical Bounce House Employee Appreciation (Play Time Events) | $513.16 |
| 8/25/22 | Sweet Truck Employee Appreciation (Sweet Jeanius Bakery) | $2,750.00 |
| 8/25/22 | Italian Ice Cream Catering Employee Appreciation | $1,575.00 |
| 8/25/22 | Reimbursement for Lost Ring (Troy Holland) | $4,138.78 |
| 8/31/22 | Photography & Video for FCSO Events (Dazzel Production & Media) | $600.00 |
| 9/1/22 | Photography & Video for FCSO Events (Dazzel Production & Media) | $1,200.00 |
| 9/9/22 | FCSO Leadership Training (Loudermilk Conference Center) | $4,200.00 |

176.

The sums in the chart above, exceed three million dollars, but likely represent only a fraction of the funds Defendant Labat misused.

177.

For the misused funds, Defendant Labat has never reimbursed the Inmate Welfare Fund.

178.

Defendant Labat's misuse of the Inmate Welfare Fund would have continued unabated absent red flags from Fulton County finance officials and a request from a Fulton County Commissioner pertaining to Inmate Welfare Fund purchases.

179.

Belatedly aware of the indefensible nature of the Inmate Welfare Fund misappropriation, Defendant Labat blamed the expenditures on having been purchased out of the wrong fund.

180.

Section 146-84 of the Fulton County Code of Ordinances provides as follows: "All purchases and other disbursement shall be made by check signed by the chief jailor and countersigned by the sheriff. All financial records relating to said welfare fund shall be approved and audited by the internal audit division of the comptroller's office and also subject to the general county audit." This Ordinance was enacted in 1983.

181.

Section 146-84 would have required Defendant Labat to countersign all checks for purchases and other disbursements made from the Inmate Welfare Fund.

182.

A countersignature on a check indicates that both signers are in agreement as to what will be done with the check in question.

183.

Defendant Labat's misappropriation of the Inmate Welfare Fund diverted funds that were sorely needed to help make the Fulton County Jail a safer and more humane place for pretrial detainees like Dino Walker.

184.

Section 146-82 of the Fulton County Code of Ordinances provides as follows: "A committee composed of the sheriff, the chief jailer, and the chairman of the board of commissioners or his appointee is hereby established, who shall be responsible for all items purchased out of the welfare fund." This Ordinance was enacted in 1983.

185.

When asked on or about October 31, 2023 about the committee required by Section 146-82, the Chair of the Fulton County Commission, Rob Pitts, stated to a reporter from WSB-TV that he had never heard of the committee, but that its existence sounded like a great idea.

186.

When asked on or about October 31, 2023 by a reporter from WSB-TV

whether the committee ever held meetings, Defendant Labat replied: "Not once have they met in my entire time being sheriff."

187.

The Committee charged with legal responsibility for all items purchased out of the inmate welfare fund never met a single time in 2020, 2021, or 2022.

188.

Defendant Labat attempted to deflect responsibility for failing to comply with the committee's ministerial duty, by using the term "they." By county ordinance, as the elected Sheriff of Fulton County, Defendant Labat was a member of the Committee overseeing the Inmate Welfare Fund that never held a meeting during his tenure as Sheriff (1/1/21 through at least October 31, 2023).

189.

Defendant Labat was aware of the almost nonexistent oversight of the Inmate Welfare Fund, including by anyone in the Sheriff's Office, the Fulton County Commission, or the Inmate Welfare Fund's Independent Auditors.

190.

Illustrative of this virtually nonexistent oversight of the Fund is a passage from the Independent Auditor's Report of the Inmate Welfare Fund for the year ended December 31, 2022. At page six of this Report the following appears: "The Fund also accounts for the disbursement of these moneys for certain items to be used for

the betterment of the prisoner population" [designation of purpose for the Inmate Welfare Fund].

191.

Notwithstanding the above-referenced designation of purpose for the Inmate Welfare Fund, the Independent Auditor's Report for the year ended December 31, 2022 failed to mention a single item from the chart above for improper 2022 expenditures from the Inmate Welfare Fund.

192.

Despite the obvious nature of the misappropriation of millions of dollars in funds designated for inmate welfare, Defendant Labat defended the expenditures in a local television interview in October 2023 by contending that "everything" spent was for "the betterment of the Sheriff's Office."

193.

The Independent Auditor's Report states that the Inmate Welfare Fund is "for the betterment of the prisoner population," Defendant Labat, on the other hand, stated that it is proper to use the Inmate Welfare Fund for the betterment of the Sheriff's Office.

194.

Specifically, Defendant Labat told a reporter from WSB-TV on or about October 31, 2023 that "[e]verything that has come out of the inmate welfare fund

has been spent on the betterment of the sheriff's office."

195.

Contrary to Defendant Labat's misrepresentation about the purpose of the Inmate Welfare Fund, the Ordinance creating it clearly sets forth its purpose, to provide "for the welfare of persons committed to the jail," [Section 146-81 of the Fulton County Code of Ordinances].

196.

On or about October 31, 2023 Defendant Labat acknowledged to a WSB-TV reporter that some of the purchases from the Inmate Welfare Fund had nothing to do with inmate welfare.

197.

On or about October 31, 2023 Defendant Labat acknowledged to a WSB-TV reporter that he had no knowledge of the county ordinance governing the Inmate Welfare Fund until shortly before his staff provided it to the local reporter.

198.

Defendant Labat contends that two employees were terminated, at least in part, due to irregularities in spending related to the Inmate Welfare Fund.

199.

On November 15, 2023, the Fulton County Board of Commissioners abolished the Inmate Welfare Fund due to Defendant Labat having misused millions

of dollars designated for the welfare of detainees. This misuse dated back to at least 2021.

200.

Among the living conditions at the Fulton County Jail that led to the United States Department of Justice launching a formal investigation of the Jail are: filthy housing, filthy housing teeming with insects, unsanitary living conditions, structurally unsafe Jail facility, failure to provide adequate medical care, inadequate mental health care, and rampant violence.

201.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to address some of these dire needs.

202.

On July 21, 2023, the National Institute of Corrections of the U.S. Justice Department and the Bureau of Justice Assistance Critical Response Team conducted a site visit to the Fulton County Jail. This site visit resulted from a September 20, 2022 (two days before Dino Walker's death) request from Defendant Labat to the National Institute of Corrections for technical assistance.

203.

Defendant Labat advised members of site visit team that the number of uniformed staff vacancies in the Jail was at a critical staffing shortage level.

204.

According to Defendant Labat, a housing floor at the Jail should ideally have two officers in the housing control room, as well as three officers who constantly move through the six housing zones, providing safety and security tours, making inspections, and managing the people detained within the zones.

205.

According to Defendant Labat, in practice, there is typically one officer in the housing control room and, at most, one officer moving through the housing zones with nearly two hundred (200) detainees.

206.

On September 23, 2022, at the time Dino Walker was killed, there was not a single officer moving through the six housing zones.

207.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to hire additional uniformed staff members or repair portions of the crumbling infrastructure from which knives/shanks were being fashioned, particularly in the more dangerous areas of the Jail, like 7-North, where Dino Walker was housed.

208.

The presence of an additional uniformed staff member at the Fulton County Jail on the cell block deserted by uniformed staff on September 22, 2022 might arguably have discouraged the knife attack on Dino Walker.

209.

The presence of an additional uniformed staff member at the Fulton County Jail on the cell block deserted by uniformed staff on September 22, 2022 might arguably have saved Dino Walker's life.

210.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to improve the living conditions of detainees at the Fulton County Jail.

211.

The living conditions of the detainees at the Fulton County Jail directly contribute to the fear of detainees, deterioration of the mental health of detainees, and further escalate the violence.

212.

The millions of dollars that Defendant Labat misappropriated from the Inmate Welfare Fund could have been used to complete one of the recommendations the National Institute of Corrections and the bureau of Justice made during their July 21,

2023 site visit to the Fulton County Jail, a recommendation that should have foreseeable to Defendant Labat long before the site visit – "Complete an inspection of each cell and dayroom, looking for loose material on bunks, desks, dayroom tables, light fixtures, plumbing, and more that could be removed and used as a weapon. If any loose materials are found, remove the material or replace the fixture."

213.

The living conditions of the detainees at the Fulton County Jail directly contributed to the proliferation of violence at the Jail.

214.

Defendant Labat was aware that the Inmate Welfare Fund was created to benefit detainees at the Fulton County Jail.

215.

Defendant Labat was aware that the misdirection of Inmate Welfare Funds to other purposes not benefitting inmates was a serious deprivation for detainees at the Fulton County Jail and, if used properly could have helped him meet his constitutional obligation to protect detainees at the Jail.

216.

Defendant Labat was aware that detainees in the Fulton County Jail, including Dino Walker, were incarcerated under conditions posing a substantial risk of serious harm.

217.

Defendant Labat was aware of the fact that the detainees at the Fulton County Jail lived under conditions that could subject them to the substantial risk of serious harm, including from other detainees.

218.

Defendant Labat ignored this substantial risk by misdirecting millions of dollars intended for the welfare of persons, including Dino Walker, committed to the Fulton County Jail.

219.

Defendant Labat was deliberately indifferent to the substantial risk of serious harm that Dino Walker faced at the Fulton County Jail, including from attacks with knives/shanks fashioned from the crumbling infrastructure of the Jail.

220.

Defendant Labat's deliberate indifference was a direct and proximate cause of the injuries, damages, and death Dino Walker suffered.

221.

The actions of the Defendant Sheriff Labat, as described above, contravened established law that a reasonable jail official should have known.

222.

Because of Defendant Labat's deliberate indifference, Plaintiff is entitled to

58

an award of damages for Walker's injuries, pain and suffering of mind and body, and death.

## COUNT III

### DEFENDANT CURT MUHAMMAD

### 42 U.S.C. § 1983: Fourteenth Amendment

### Deliberate Indifference to Risk of Serious Harm.

### 223.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 125 above as if fully restated herein.

### 224.

Dino Walker, as a pretrial detainee, was entitled to the protection of his constitutional rights under the Fourteenth Amendment, including protection from deliberate indifference to his safety and well-being.

### 225.

Defendant Muhammad breached his duty as a correctional officer to protect inmates from unnecessary violence and refrain from violating their constitutional rights under the Fourteenth Amendment.

### 226.

The wrongful conduct of Defendant as alleged herein was a direct and proximate cause of Dino Walker's death.

227.

But for Defendant's deliberate actions of abandoning his post of duty, Dino Walker would not have suffered injury.

228.

Defendant's actions posed a substantial risk of serious harm to Charlie.

229.

Defendant was deliberately indifferent to that risk.

230.

Defendant knew the risk of his actions would cause serious harm to Dino Walker, disregarded that risk and failed to take reasonable measures to discontinue their conduct.

231.

Defendant did not take available measures to abate that risk, and a reasonable correctional officer in the same circumstances would have appreciated the high degree of risk involved, making the consequences of his conduct obvious.

## COUNT IV

## DEFENDANT MUHAMMAD

Violation of ministerial duties

under Georgia law

232.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 125 above as if fully restated herein.

233.

Defendant Muhammad was required to perform a visual well-being check of all inmates in 7-North every 30 minutes, but he instead abandoned his post during the hour of Walker's death.

234.

Defendant Muhammad was required to conduct security rounds once per hour in all housing units in 7North, but instead abandoned his post during the time period when Dino Walker was killed on September 22, 2022.

235.

Defendant Muhammad breached these ministerial duties by failing to perform the required visual well-being checks or the security rounds.

236.

Defendant Muhammad's absence from his post occurred with full knowledge that the risk of being harmed or killed facing the inmates in 7North was higher than in other areas of the Jail.

237.

To leave the Jail's most violent inmates unsupervised for an hour is criminally

negligent.

238.

Defendant Muhammad's abandonment of his post was an intentional decision, while knowingly allowing violent inmates with ready access to materials to fashion weapons, to roam the Jail outside their cells unsupervised.

239.

Walker would have lived had the mandated ministerial duties been performed during the hour that Defendant Muhammad abandoned his post.

240.

Defendant Muhammad breached these duties resulting in a deprivation of Plaintiff's life and liberty interests protected by the Georgia Constitution's due process guarantees. See Ga. Const. Art. I, § I, ¶¶ I & II.

## COUNT V

### 42 U.S.C. § 1983; Supervisory liability of

### Sheriff Labat arising from Defendant Muhammad's failure

### to perform visual well-being checks and security rounds

### during the hour of Dino Walker's death

241.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 125 above as if fully restated herein.

242.

Defendant Sheriff Labat's supervisory failure, including his failure to adequately supervise Defendant Muhammad and others, created a causal connection to the fatal attack on Dino Walker.

243.

Defendant Labat was well aware of the severe understaffing at the Fulton County Jail.

244.

Defendant Labat was well aware that as a result of the severe understaffing a regular part of Defendant Muhammad's job, posting the head count inside the watch commander's office, would require him to leave his assigned area of 7-North, effectively leaving 7-North, one of the most violent areas in the Fulton County Jail, unattended for a significant period of time. Upon information and belief, this is a pattern of absence from 7-North of which the detainees on 7-North would have become aware over time.

245.

Defendant Sheriff Labat was well aware of the history of widespread inmate-on-inmate abuse and violence at the Fulton County Jail, including in 7-North, where Dino Walker was housed.

246.

The deplorably unsanitary condition of the Jail, the serious overcrowding of the Jail, the serious understaffing of the Jail, and the ready availability of materials from which to fashion knives/shanks could be fashioned were known contributors to inmate-on-inmate abuse and violence but were left largely unaddressed by Defendant Labat.

247.

Defendant Labat's deficiencies in supervision encompass the inadequate handling of substantial overcrowding, critical understaffing, and the proliferation of weapons made from the crumbling infrastructure of the Jail.

248.

Defendant Labat's failure to act constitutes deliberate indifference to Walker's safety and well-being, resulting in serious harm – Dino Walker's death.

249.

By not providing for the continuous presence of detention officers on 7-North when detainees were outside their cells, Defendant Labat personally participated in the violation of Walker's constitutional rights.

250.

Defendant Labat was well aware of the critical staffing shortages at the Jail, including on September 22, 2022.

251.

On July 21, 2023, the National Institute of Corrections (NIC) [of the U.S. Department of Justice] and the Bureau of Justice Assistance (BJA) made a site visit to the Fulton County Jail.

252.

Defendant Labat informed the NIC and BJA that the number of uniformed staff vacancies in the Jail was at a critical staffing shortage level.

253.

Defendant Labat informed the NIC and BJA that a housing floor at the Fulton County Jail should ideally have two officers in the housing control room, as well as three officers who constantly move through the six housing zones, providing safety and security tours, making inspections, and managing the people detained within the zones.

254.

Defendant Labat admitted to the NIC and BJA that, in practice, there is typically only one officer in the Jail's housing control room and, at most, one officer, moving through the housing zones with nearly two hundred detainees.

255.

Defendant Labat further admitted to the NIC and BJA delegation that observation of detainees at the Fulton County Jail was intermittent and that generally interaction

with Jail staff was limited to a roving officer who moves in and out of the housing units.

256.

Defendant Labat was aware that with only one officer moving through the housing zones, if that officer left, for example, to turn in a head count to the watch commander's office, there would be no officer remaining to attend to the nearly 200 out of cell detainees in the housing zones, including on 7-North.

257.

By Defendant Labat not providing for the continuous presence of detention officers on 7-North when detainees were outside their cells, there is a causal connection between Defendant Labat's actions as the supervising official at the Fulton County Jail and the violation of Dino Walker's constitutional right to be protected as a detainee.

258.

The causal connection for Defendant Labat's supervisory liability exists based on a history of critical understaffing, along with a history of widespread violence, including knife violence at the Jail, that would have put Defendant Labat on notice of the need to correct the constitutional violation (failure to protect a detainee's health and well-being). Notwithstanding, Defendant Labat failed to make sure there was the continuous presence of a detention officer on 7-North when the detainees

were outside their cells.

259.

Defendant Labat's supervisory liability is a direct and proximate cause of Dino

Walker's injuries, pain and suffering, and death.

## **COUNT VI**

### Supervisory Liability under 42 U.S.C. § 1983

### Against Sheriff Labat for failing to relocate Walker to a Different

### Floor after Being Attacked in April 2022

260.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 125 above as if fully restated herein.

261.

Defendant Sheriff Patrick Labat, as the supervisor of the Fulton County Jail, is liable for the constitutional violations suffered by Dino Walker.

262.

Just months before he was killed, Dino Walker was attacked by another inmate who was awaiting a murder trial, demonstrating the need for heightened security and for Walker to be placed in a safer environment.

263.

Upon information and belief, Defendant Labat was aware of this prior attack

on Dino Walker well before September 22, 2022.

264.

Despite the known risks and previous violent incident, Defendant Labat failed to take appropriate measures, such as moving Walker to a different floor, or implementing enhanced security protocols with respect to Dino Walker.

265.

Defendant Labat's failure to act constitutes deliberate indifference to Walker's safety and well-being, resulting in serious harm – Dino Walker's death.

266.

By not relocating Dino Walker following the violent attack on him, Defendant Labat personally participated in the violation of Walker's constitutional rights.

267.

By not relocating Dino Walker following the violent attack on him, there is a causal connection between Defendant Labat's actions as the supervising official at the Fulton County Jail, there is a causal connection between Defendant Labat's actions as the supervising official and the violation of Dino Walker's constitutional right to be protected as a detainee.

268.

The causal connection for Defendant Labat's supervisory liability exists based on a history of widespread violence, including knife violence at the Jail, that would

have put Defendant Labat on notice of the need to correct the constitutional violation (failure to protect a detainee's health and well-being). Notwithstanding, Defendant Labat failed to relocate Dino Walker or provide specific protection to him in light of the physical attack upon him by other detainees.

269.

Defendant Labat's supervisory liability is a direct and proximate cause of Dino Walker's injuries, pain and suffering, and death.

## DAMAGES

## WRONGFUL DEATH DAMAGES

## All Defendants

270.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 125 above as if fully restated herein.

271.

Plaintiff, as the legal representative of Mr. Walker's estate is entitled to recover damages under Georgia's Wrongful Death Act, O.C.G.A. §51-4-2, and as otherwise provided by law.

## PUNITIVE DAMAGES

## Defendants Labat and Muhammad

272.

Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 271 above as if fully restated herein.

273.

The conduct of Defendant Labat and Defendant Muhammad, as described above, rose to the level of reckless, willful, and wanton failure to act, which demonstrated a conscious deliberate indifference to the consequences of their actions and entitles Plaintiff to an award of punitive damages as allowed by law.

WHEREFORE Plaintiff demands as follows:

a)    That this action be tried by a jury;

b)    That general and compensatory damages be entered in favor of Plaintiff and against Defendants in an amount to be determined by the enlightened conscience of fair and impartial jurors;

c)    That Plaintiff be awarded punitive damages against each Defendant who has been sued in his individual capacity.

d)    That Plaintiff be awarded reasonable attorney's fees, expenses, and costs of litigation;

e)    That all costs of this action be taxed against Defendants; and

f)    That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

This 19th of November, 2024.

<div style="margin-left: 45%;">

*/s/ Harold W. Spence*
HAROLD W. SPENCE
Georgia Bar No. 671150
MAWULI M. DAVIS
Georgia Bar No. 212029

</div>

**DAVIS BOZEMAN LAW FIRM, P.C.**
4153 B Flat Shoals Parkway
Suite 204 Decatur, GA 30034
Telephone: (404) 244-2004
Facsimile: (404) 244-2020
hspence@davisbozemanlaw.com
mdavis@davisbozemanlaw.com

<div style="margin-left: 45%;">

*/s/ Cary S. Wiggins*
CARY S. WIGGINS
Georgia Bar No. 757657

</div>

**WIGGINS LAW GROUP, LLC**
260 Peachtree Street, NW
Suite 401 Atlanta, Georgia 30303
Telephone:  (404) 659-2880
cary@wigginslawgroup.com

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **TAMARRA E. STUPPARD-WILSON,** as Administratrix of the Estate of **DINO VANDARREL WALKER,** Deceased**,**<br><br>          **Plaintiff**,<br>**v.**<br><br>**FULTON COUNTY, GEORGIA**, a political subdivision of the State of Georgia, **SHERIFF PATRICK LABAT,** in his individual capacity, and **CURT MUHAMMAD,** individually,<br><br>          **Defendants**. | **JURY TRIAL DEMANDED**<br><br>CIVIL ACTION<br>FILE NO. 1:24-cv-03400-TWT |

I hereby certify that I have this day electronically filed with the Clerk of Court and served a copy of **PROPOSED SUPPLEMENT TO FIRST AMENDED COMPLAINT FOR DAMAGES** and upon Defendants' counsel of record, via statutory electronic transmission and/or by depositing a copy of the same in the United States Mail in a properly addressed envelope with adequate postage thereon to ensure delivery thereto:

Kaye Burwell, Esq.
Richard Caplan, Esq.
Mathew Plott, Esq.
Bardley M. Harmon, Esq.
**OFFICE OF THE FULTON COUNTY ATTORNEY**

141 Pryor Street SW, Ste. 4038
Atlanta, Georgia 30303
kaye.burwell@fultoncountyga.gov
richard.caplan@fultoncountyga.gov
matthew.plott@fultoncountyga.gov
(*Attorneys for the Defendants'*)


This 19th of November, 2024.


/s/ *Harold W. Spence*
HAROLD W. SPENCE
Georgia Bar No. 671150
MAWULI M. DAVIS
Georgia Bar No. 212029
*Attorneys for Plaintiff*

**DAVIS BOZEMAN JOHNSON LAW, P.C.**
4153-C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
(404) 244-2004
hspence@davisbozemanlaw.com
mdavis@davisbozemanlaw.com

/s/ Cary S. Wiggins
CARY S. WIGGINS
Georgia Bar No. 757657

**WIGGINS LAW GROUP, LLC**
260 Peachtree Street, NW
Suite 401 Atlanta, Georgia 30303
Telephone:  (404) 659-2880
cary@wigginslawgroup.com